### BANCO MINERO v. ROSS & MASTERSON.†

(Court of Civil Appeals of Texas. San Antonio. May 3, 1911. On Motion for Rehearing, June 7, 1911.)

1. CORPORATIONS (§ 669*) — FOREIGN CORPORATIONS—JURISDICTION.

A foreign corporation engaged in business in the country of its domicile, personally appearing in an action against it, and filing its answer therein, thereby gives the court jurisdiction over it.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2641, 2642; Dec. Dig. § 669.*]

2. CORPORATIONS (§ 665*) — FOREIGN CORPORATIONS—ACTIONS—JURISDICTION.

Where, in an action against a foreign corporation engaged in business in the country of its domicile, the corporation was served constructively only, and a domestic corporation was actually served as garnishee, and the foreign corporation personally appeared and filed its answer, the court had jurisdiction by reason of impounding in court the money and property of the foreign corporation in the possession of the garnishee.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 665.*]

3. COURTS (§ 7*)—JURISDICTION—TRANSITORY ACTIONS—ACTION FOR CONVERSION.

A conversion of personal property is a trespass for which an action lies anywhere jurisdiction of the person of the wrongdoer may be obtained.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 14, 16, 22–31; Dec. Dig. § 7;* Trover and Conversion, Cent. Dig. § 181.]

4. COURTS (§ 7*) — JURISDICTION — SUBJECT-MATTER—TRANSITORY ACTIONS.

A petition in an action by a resident against a foreign banking corporation for the conversion of money deposited with it pursuant to a contract for the purchase of real estate located in the foreign country, to be held by the bank for delivery to the vendor on specified conditions, which alleges the deposit and the contract of purchase and that the bank misappropriated the money by paying it over wrongfully, states a transitory cause of action, and a court of Texas which acquired jurisdiction over the foreign corporation by its appearance and filing answer, had jurisdiction also over the subject-matter.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 14, 16, 22–31; Dec. Dig. § 7.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

† Application for writ of error pending in Supreme Court.

5. BANKS AND BANKING (§ 154*)—PARTIES—NECESSARY PARTIES.

A purchaser suing a bank for damages for the conversion of money, deposited with it by him for the payment of the price on specified conditions, need not make the vendor, who obtained the money from the bank without compliance with the conditions, a defendant, where no relief is demanded from the vendor.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 154.*]

6. BANKS AND BANKING (§ 154*)—EVIDENCE—ADMISSIBILITY.

In an action by a purchaser against a bank for the conversion of money deposited with the bank for payment to the vendor on specified conditions, evidence of fraudulent representations inducing the execution of the contract of purchase, was inadmissible, the bank not being a party to the contract, and the matters relating thereto as between the parties having been adjudicated without affecting the liability of the bank for the deposit.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 154.*]

7. APPEAL AND ERROR (§ 1054*)—HARMLESS ERROR — ERRONEOUS ADMISSION OF EVIDENCE.

The error, if any, in admitting improper evidence in an action tried without a jury, is harmless where evidence properly admitted supports the judgment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4185, 4186; Dec. Dig. § 1054.*]

8. APPEAL AND ERROR (§ 1071*)—HARMLESS ERROR—ERRONEOUS FINDINGS.

Where a contract for the purchase and sale of real estate which induced the purchaser to deposit a part of the price in a bank for payment to the vendors on specified conditions, was signed by one of the vendors for himself and co-vendor, and both vendors acted on the contract, the liability of the bank for wrongfully paying over the money was unaffected by any error in a finding as to the sufficiency of the execution of any option for the purchase of the property because not sustained by evidence.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 1071.*]

9. CORPORATIONS (§ 669*)—JURISDICTION—ACTIONS IN PERSONAM.

An action by a purchaser of land in a foreign country against a banking corporation domiciled there for damages for the conversion of a deposit, made by the purchaser in pursuance of the contract of purchase for delivery to the vendor on specified conditions, based on the bank's wrongful payment of the deposit to the vendor, is an action in personam unaffected by the contract between the purchaser and the vendor, so that where the corporation voluntarily submits itself to the jurisdiction of the court it cannot urge that the court is without jurisdiction of the case on the ground that the subject-matter is not within the court's jurisdiction.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 669.*]

10. JUDGMENT (§ 17*)—JUDGMENT IN PERSONAM—VALIDITY—JURISDICTION OF DEFENDANT.

A judgment in personam, as distinguished from one in rem, is invalid unless the court had jurisdiction of the person of defendant, and jurisdiction cannot be obtained against nonresidents on mere publication of process.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 25–33; Dec. Dig. § 17.*]

11. EQUITY (§ 63*)—JURISDICTION—COMPELLING PERFORMANCE OF ACTS BY DEFENDANT.

Equity acts directly on the person of defendant by compelling him to do what in equity he should do.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 184; Dec. Dig. § 63.*]

12. VENDOR AND PURCHASER (§ 301*)—ACTION IN PERSONAM.

An action by a vendor on the contract of sale brought to determine the personal rights and obligations of the purchaser, is merely a suit in personam.

[Ed. Note.—For other cases, see Vendor and Purchaser, Dec. Dig. § 301.*]

13. JUDGMENT (§ 528*)—OPERATION.

Where the subject-matter of a controversy is situated in another state or country while the parties are within the jurisdiction of the court, the suit is maintainable, and a remedy directly operating on the person of defendant and not on the subject-matter may be granted, though the subject-matter is referred to in the judgment, and though defendant is ordered to do or to refrain from certain acts toward it.

[Ed. Note.—For other cases, see Judgment, Dec. Dig. § 528.*]

14. COURTS (§ 11*)—JURISDICTION—SUBJECT-MATTER—PARTIES.

Where one is liable either in consequence of a contract or as a trustee or as holder of the legal title acquired in bad faith, equity has jurisdiction wherever the person of defendant may be found, though the subject-matter is without the jurisdiction of the court.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 11.*]

15. JUDGMENT (§ 17*)—JURISDICTION—SUBJECT-MATTER—PARTIES.

Where property has not been attached or impounded by judicial process so as to place it in the custody of the court subject to its decree, equitable decrees can only act in personam and are void as against one served by constructive process and not personally appearing in the case, in the absence of a statute making an equity decree equivalent to a conveyance.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 25–33; Dec. Dig. § 17.*]

16. JUDGMENT (§ 831*)—FOREIGN JUDGMENT—VALIDITY.

A judgment of a foreign court against purchasers contracting for the purchase of real estate situated in the foreign country, rendered on mere service of publication as authorized by the laws of such foreign country, but without impounding or bringing into the custody of the court any property of the purchaser, is merely a judgment in personam, and is without force.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1519–1522; Dec. Dig. § 831.*]

17. JUDGMENT (§ 17*)—JURISDICTION.

Money has no situs, but accompanies the owner, and his right to it is determined by the law of the country where he may be when a suit to affect his right to it is instituted, and, unless the money is brought within the custody of the court in which the suit is instituted, the action as to him is strictly in personam, and where his person is not brought within the jurisdiction of the court by actual service of process any judgment rendered against him is void unless he voluntarily appears.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 25–33; Dec. Dig. § 17.*]

18. COURTS (§ 29*)—JURISDICTION—EXTENT.

No sovereignty can extend its process beyond its own territorial limits so as to subject

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

either person or property to its judicial decisions.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 112–118; Dec. Dig. § 29.*]

**19. JUDGMENT (§ 17*)—JURISDICTION — PARTIES.**

Where a suit by the vendor on a contract made by a citizen of Texas with a citizen of a foreign country, domiciled there, for the sale of land in Texas, is brought in a state court to recover the agreed price, the vendor tendering a deed in accordance with the contract, and the only service on the purchaser is constructive, and he does not appear, the judgment for the vendor for the price is invalid for want of jurisdiction.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 25–33; Dec. Dig. § 17.*]

**20. JUDGMENT (§ 528*)—OPERATION.**

An action by a purchaser in a state court, having jurisdiction of the subject-matter, for the specific performance of a contract, the purchaser tendering into court the purchase price, is an action in rem, and a judgment is self-executing, though the vendor was served only with constructive notice.

[Ed. Note.—For other cases, see Judgment, Dec. Dig. § 528.*]

**21. JUDGMENT (§ 831*)—FOREIGN JUDGMENT—CONSTRUCTIVE SERVICE—EFFECT.**

A vendor domiciled in a foreign country sued in a court there to enforce a contract of sale made with a nonresident purchaser, who had deposited a part of the price in a bank within the jurisdiction of the foreign court for payment to the vendor on specified conditions. The purchaser was served only with constructive process, and he did not personally appear. The money deposited by the purchaser was not seized by any process or in any way brought into the custody of the court. *Held,* that the judgment for the vendor was in personam and without binding effect on the courts of Texas.

[Ed. Note.—For other cases, see Judgment, Dec. Dig. § 831.*]

**22. JUDGMENT (§ 831*)—FOREIGN JUDGMENT—VALIDITY—COMITY BETWEEN NATIONS.**

The comity obtaining between foreign governments does not require a state to go further than to give a judgment rendered in a foreign jurisdiction the respect given a like judgment rendered in a court of such state, and a state will not sanction a wrong done its citizens abroad by means deemed illegal if done within its limits.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1519–1522; Dec. Dig. § 831.*]

**23. JUDGMENT (§ 831*)—FOREIGN JUDGMENT—VALIDITY—COMITY BETWEEN NATIONS.**

The effect here of a foreign judgment is not determined by how it is regarded by the courts of the country where rendered, but what effect they will give a judgment of the same kind rendered by the courts of a foreign country in which it may be the basis of an action or a ground for defense.

[Ed. Note.—For other cases, see Judgment, Dec. Dig. § 831.*]

**24. JUDGMENT (§ 831*) — JURISDICTION OF PERSON.**

Jurisdiction of the person may be given by consent, and one voluntarily appearing in the courts of a foreign country in obedience to process or otherwise, and who submits himself to its jurisdiction, is bound by the judgment though the court may not have bound him in the absence of such act on his part.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1519–1532; Dec. Dig. § 831.*]

**25. JUDGMENT (§ 831*)—FOREIGN JUDGMENT—RIGHT TO ATTACK.**

One voluntarily appearing in the courts of a foreign country and submitting himself to the jurisdiction thereof is not thereby precluded from urging the invalidity of the judgment in the courts of Texas on grounds other than want of jurisdiction over his person.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1519–1522; Dec. Dig. § 831.*]

**26. JUDGMENT (§ 831*)—FOREIGN JUDGMENT—VALIDITY.**

Where a foreign judgment was void as to one defendant for lack of jurisdiction over his person and as to the codefendant personally appearing because he was arbitrarily denied the right of appeal, the court of Texas need not determine whether the judgment relied on as a defense could be impeached for fraud as to the merits between the parties.

[Ed. Note.—For other cases, see Judgment, Dec. Dig. § 831.*]

**27. BANKS AND BANKING (§ 153*)—DEPOSITS.**

A purchaser in a contract for a purchase of real estate situated in a foreign country, deposited in a bank of such country a part of the price for delivery by the bank to the vendor on specified conditions, which were not performed. The vendor obtained a judgment in the foreign country against the purchaser to compel payment of the price, but the money deposited with the bank was not seized nor brought into court, and the bank was not a party to the action. Subsequent to the judgment the bank paid the money to the vendor pursuant to direction of the foreign court. *Held,* that the bank was liable for converting the deposit, and the purchaser could sue for the damages sustained.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 153.*]

**On Motion for Rehearing.**

**28. PROCESS (§ 48*)—JURISDICTION.**

The court in a suit to enforce a lien or to determine conflicting claims of title, or to recover possession of property or to obtain a judgment enforceable against property seized under attachment, or other process, may provide methods of serving process on defendant which will affect residents or nonresidents.

[Ed. Note.—For other cases, see Process, Dec. Dig. § 48.*]

**29. JUDGMENT (§ 17*)—JURISDICTION—SUBJECT-MATTER.**

Where personal property within the territorial limits of a court's jurisdiction was not impounded or brought before the court by process to await final judgment, the property could not be subject to a personal judgment against the foreign owner on whom constructive service only was had and who did not submit his person to the jurisdiction of the court.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 25–33; Dec. Dig. § 17.*]

**30. SPECIFIC PERFORMANCE (§ 106*)—CONTRACTS FOR SALE OF REAL ESTATE—PARTIES.**

An action by a vendor to enforce a contract for the sale and purchase of land must make all the purchasers defendants, and where jurisdiction is not obtained over the person of one of the purchasers specific performance of the entire contract cannot be enforced against another purchaser voluntarily submitting to the jurisdiction of the court.

[Ed. Note.—For other cases, see Specific Performance, Dec. Dig. § 106.*]

**31. EVIDENCE (§ 594*)—LAWS OF FOREIGN COUNTRY—QUESTIONS OF FACT.**

The question of what the law of a foreign country is is one of fact, and the finding of the

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

trial court is not absolutely controlled by the testimony of witnesses though uncontradicted.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2431; Dec. Dig. § 594.*]

Appeal from District Court, El Paso County; A. M. Walthall, Judge.

Action by Ross & Masterson against the Banco Minero. From a judgment for plaintiffs, defendant appeals. Affirmed.

T. A. Falvey, Waters Davis, and J. M. Goggin, for appellant. R. H. Ward, Beall & Kemp, Baker, Botts, Parker & Garwood, and H. Masterson, for appellees.

NEILL, J. This suit was brought by J. O. Ross and H. Masterson, resident citizens of the state of Texas, against the Banco Minero, a corporation organized under the laws of the state of Chihuahua, republic of Mexico, with its principal office and place of business in the city of Chihuahua, to recover against the defendant the sum of $40,000, with interest from the 30th day of July, 1907, at the rate of 6 per cent. per annum. The grounds upon which the recovery was sought were substantially alleged as will be found in our conclusions of fact. On the 27th of October, 1908, at the time the suit was instituted, the plaintiffs sued out a writ of garnishment on the Guaranty Trust & Banking Company, a corporation organized under the laws of the state of Texas with its principal place of business in the city of El Paso, which writ was on the same day served on the garnishee as required by law. After the service of the writ, the Guaranty Trust & Banking Company filed its answer admitting that it was indebted to the defendant Banco Minero in the sum of $7,500, subject to a credit of $1,343.60, and that said defendant was the owner of 1,057 shares of capital stock of said garnishee of the value of $150,700. The defendant Banco Minero was cited by service of notice as prescribed by our statutes to nonresidents. The defendant answered by a plea to the jurisdiction of the court, alleging that it was a foreign corporation, incorporated under the laws of the republic of Mexico, was not a citizen of the state of Texas nor of the United States of America; that it did no business in Texas, and had no office, officer, or agent in El Paso county or state of Texas; that plaintiffs' cause of action arose wholly within the state of Chihuahua, republic of Mexico, and was a local action cognizable only by the courts of Chihuahua, and not by the court of El Paso county, Tex. Defendant then pleaded a general denial and not guilty, and afterwards, in the same answer, pleaded as res adjudicata a certain judgment and matters of fact pertaining thereto, which are set out in our conclusions of fact. The case was tried before the court, without a jury, and judgment was rendered for plaintiffs

against the Banco Minero in the sum of $40,000 with interest thereon at the rate of 6 per cent. per annum from the 30th day of January, 1908, amounting in the aggregate to the sum of $45,500, together with the interest on said sum at the rate of 6 per cent. per annum from the date of its rendition. The Banco Minero has appealed from this judgment.

### Conclusions of Fact.

Conclusions of fact were filed in the case by the trial judge, and as his conclusions are supported by the evidence, they are in everything concurred in and adopted by us; but as they are set out at great length, including copies of documents, we will endeavor to state the substance with less prolixity.

First. On December 13, 1906, Alberto Terrazas of Chihuahua, Mexico, gave a written option to T. H. Swain for the sale of 120,000 acres of land, more or less, belonging to Lauro Carrillo and the said Terrazas, lying southwest of Minaco in said republic. The option was exclusive, and continued from its date until April 16, 1907, in accordance with a letter of Terrazas of even date with the option contract. During the period of the option Swain was given full authority to negotiate the sale of the property in accordance with the conditions stipulated in Terrazas' letter, the land referred to being known as the Lauro Carrillo grant and is situated in the state of Chihuahua. In the letter it was stipulated (1) that "the price per hectarea is to be two peso ($2.00) (Mexican silver), net to me, no commission to be paid"; (2) "you are at liberty to obtain whatever price you may be able to secure from the prospective buyer, all over and above the mentioned price, $2.00 (Mexican silver) per hectarea to be your commission. I agree to protect you in whatever price you may agree upon between you and the buyers"; (3) "I prefer that the payment should be all cash, and expect to secure that arrangement, as it will be as much to your advantage as to mine, but if you find it difficult, I will concede that the terms shall be one-half cash and the balance in six months after the first payment, with interest at 7 per cent. per annum"; (4) "Should the parties fail to consummate the purchase of the property by January 16, 1907, I will give you an exclusive option of three months more, or until April 16, 1907, for $1,000 Mexican silver, or $333.33⅓ Mexican silver per month."

Second. At the time the option contract was made J. Y. Baskin was a partner of Swain, and jointly interested with him in such contract. On March 5, 1907, said Swain, in a letter of that date, informed Baskin that he had given John R. Fulkerson of El Paso, Tex., an exclusive option upon the property until the 1st of April, 1907, with the privilege of an extension to April 16,

1907, and in the event that the option from the owner could be extended to May 1, 1907, with the privilege of a further extension to that date, and that Baskin was to share equally in the sale of the property, should Fulkerson succeed in consummating the deal, or should they by mutual agreement with him consummate a deal with other parties during the period of the option; and on March 3, 1907, Swain addressed a letter to Fulkerson in conformity with his letter to Baskin, and on the 9th of April, 1907, Fulkerson addressed a letter to Swain informing him that he had granted an interest in the contract to Mark Miller.

Third. Swain, Baskin, Fulkerson, and Mark Miller, by virtue of the contracts and agreements, were all interested in and owners of the contracts aforementioned. Mark Miller, with the authority of all the parties interested in the same, began negotiations with plaintiffs Ross and Masterson for the sale of the land, the Lauro Carrillo grant, and in the early part of 1907 Mark Miller went to Houston, where plaintiffs resided, and informed them of the option hereinbefore stated the parties had for the sale of the Chihuahua land, and that it would make an average cut of 4,500 feet of timber to the acre; that it was well watered and good grazing land, suitable for pasture purposes and could be had for $1.25 per acre. This was in February, 1907. On March 6, 1907, Mark Miller, in a letter of that date to plaintiff J. O. Ross, confirmed a telegram previously sent, which telegram is as follows: "Option secured for 60 days, have sent expert. Get your parties ready to go down. I am writing you to-day." In that letter it was also stated that he had sent an expert to examine the land whose report should be ready inside of 20 days. In this letter Miller offered to meet the parties selected by plaintiffs to examine the land and go with them to make the examination, or else to take the report of the expert and close it as it now stands. The expert referred to by Miller was one S. Bush, who made a report as follows:

"Report on Lauro Carrillo Timber Tract.

"Mr. John R. Fulkerson, El Paso, Texas— Dear Sir: In compliance with your instructions, I have made examination of the above-named timber tract, and herewith submit you my report upon same.

"Location. This property is located along the line of the Orient Railway, the nearest part being about five miles from said line, some thirty miles south of Minaca, state of Chihuahua.

"Extension. Approximately this timber covers an extension of 120,000 acres, or nearly 200 sections of land.

"Accessibility. While there may be some tracts of a small size that are more accessible than this one, when taking into consideration the amount of territory covered, I consider it one of the most accessible tracts in the state of Chihuahua. It is accessible for railroad entrance both from the west and the north; from the west if Local Manager Trevino, of the Orient, builds the five miles of contemplated railroad to his new sawmill. Three or four miles will extend it to this property. From the north an easy grade is found down the Temechic river, which heads in the center of the tract, this river touching the Orient about kilometer 19 south of Minaco.

"Mill Sites. While the property abounds in good water, and offers numbers of fine mill sites, I wish particularly to call your attention to a point eminently adapted for the location of a large mill, around which extends in all directions heavy bodies of timber. This point is near the middle of the west line, and in the basin of the Mestonia spring.

"Quality of Timber. While the quality of this timber is not up to that of the Wisconsin and northern states, the altitude at which this timber grows (8,000 to 9,000 feet) gives it a thrifty and flexible fiber, and makes it second to none in the States.

"Cut of Timber. As a very conservative estimate, I will say this tract will cut on an average of 4,500 feet of lumber per acre, 15 ties and 18 telegraph poles.

"Foreign. In closing this report, I wish to refer to the fact that the whole of this property is unusually well sodded in grasses, considering that it is a pine country, and that green grass is abundant the year around. I encountered cattle, sheep, and horses in different parts of the tract, and they were in better condition than those on other ranges between this point and Chihuahua, thus making it a valuable ranch proposition after the timber has been taken off.

"Hoping that this will give you sufficient data to form an adequate conception of the value of this body of timber land, I am, Respectfully yours, S. Bush. Chihuahua, Mexico, March 21st, 1907."

This report of Bush was submitted to plaintiffs by Mark Miller during the negotiations for the purchase of the land.

Fourth. In pursuance of said negotiations and prior to April 10, 1907, plaintiffs Masterson and Ross sent T. S. Masterson and H. C. Birch, a timber estimator, to El Paso, and from there to Chihuahua to meet Mark Miller and J. Y. Baskin to examine the land, estimate the timber, and to be shown the land as agreed upon. T. S. Masterson, H. C. Birch, Mark Miller, J. Y. Baskin, and S. Bush proceeded from Chihuahua to the land, and Birch and Masterson were shown the land by Mark Miller, J. Y. Baskin, and S. Bush, Masterson and Birch acting for plaintiffs, Baskin, Miller, and Bush acting for the sellers of the land. Masterson and Birch were carried over the land and shown the same by the other parties named, and Birch

made an estimate of the amount of timber that the land so shown would cut per acre.

Fifth. On May 8, 1907 Alfred H. Kraft, at the instance of John H. Fulkerson, obtained a contract from Alberto Terrazas in the form of a letter which is as follows: "Chihuahua, May 8th, 1907. Mr. Alfred Kraft, City— Dear Sir: I hereby authorize you to sell about one hundred and twenty-five thousand acres of land, belonging to Mr. Lauro Carrillo and myself, for which you hold an option dated April 30th, on the following conditions: 1st. Purchasers to deposit as earnest money in the Banco Minero, of this city, ten thousand dollars ($10,000.00) U. S. currency, on or before the 12th inst. 2nd. Purchasers to deposit in Banco Minero, of this city, forty thousand dollars ($40,000.00) U. S. currency, on or before the 30th inst. 3rd. The ten thousand dollars ($10,000.00) and forty thousand dollars ($40,000.00) referred to in the previous clauses will constitute first payment of land. 4th. The payment of ten thousand dollars ($10,000.00) will be forfeited in my favor should the purchasers fail to comply with clause 2nd. 5th. Deferred payments to be made in six and twelve months bearing eight (8) per cent. interest. Yours truly, Alberto Terrazas."

Fulkerson was interested in the contract with Kraft, and it was obtained by Kraft at his request for the benefit of both. In pursuance of the agreement evidenced by the contract last above mentioned, plaintiffs, J. O. Ross and H. Masterson, and Albert Kraft and John Fulkerson met in the city of El Paso on the 8th day of May, 1907, and executed the contract sued on, which recites that it was made and entered into between A. H. Kraft (concurred in by John R. Fulkerson and Don Alberto Terrazas), parties of the first part, and J. O. Ross and H. Masterson, parties of the second part, and further recites that Kraft has and holds an option contract of date April 30, 1907, for the purchase of certain lands in said contract mentioned and referred to from Don Alberto Terrazas, the substance of which contract is as follows:

The parties of the first part hereby agree to sell and convey unto said parties of the second part said properties and all of it for and at the price of $1 gold per acre on the terms and conditions hereinafter stipulated.

That parties of the second part have agreed and hereby agree to purchase said property upon said terms and conditions named herein.

That parties of the first part for and in consideration of the sum of $10,000, gold, being paid to Don Alberto Terrazas by said parties of the second part on or before the 12th day of the present month, and upon the said Terrazas concurring in, ratifying, and approving this contract and in further consideration of $40,000 gold being deposited in the Banco Minero of Chihuahua, Mexico, by said parties of the second part to the owner's credit on or before the 30th inst. to be paid nevertheless by said bank on the order and advice of the second party to Don Alberto Terrazas when and as soon as a survey had been made of said property, corner and corners established, and situation of land determined, and number of acres ascertained, and the title of said property being passed upon and accepted by some competent attorney of the state of Chihuahua, selected by said party of the second part, and the tender by the owners of said land of a full warranty deed to said party of the second part (or whomsoever they may name) as the term is used and understood in the state of Texas, and execution and tender delivery thereof made in accordance with the laws of Chihuahua, and when the foregoing acts and tender have been made, as a part of the closing of this transaction said parties of the second part are to execute and tender to said Terrazas the notes bearing even date with the deed to them or their nominee in favor of the said Terrazas for the balance of the purchase money for said property at $1 per acre gold for the actual acreage ascertained as hereinbefore provided, in equal payments payable on or before 6 or 12 months, respectively, and bearing interest at the rate of 8 per cent. per annum from said date, and secured by a lien on said property responsive to the vendor's lien in the state of Texas in such manner and form as such transactions are conducted and done in the state of Chihuahua.

That said survey is to be made in accordance with the time provided for in said option contract hereinbefore mentioned between said Kraft and Don Alberto Terrazas, which said Kraft here undertakes and obligates himself to do as a part of this contract. The said Kraft is to notify said parties of the second part at least five days in advance of the time that the survey is to commence for the purpose and with the view of affording said parties of the second part an opportunity to have a representative along with the surveying corps making said survey for said Kraft.

"That it is expressly and equally agreed between all the parties herein that said property is to cost said parties of the second part not in excess of $1 per acre gold, but the parties of the second part are to pay that amount as hereinbefore provided when and at the time said final transfer papers are executed and delivered. All costs of delivery, including all taxes and cost of transfer are to be borne by the said Kraft. Said property is to be delivered to said parties of the second part free of all claims and incumbrances of any description, save and except the vendor's lien hereinbefore provided for in favor of said Don Alberto Terrazas. In determining the situation of land included in this contract of sale the measurements of the state of Chihuahua shall be reduced to acreage as understood and used in the state of Texas, the said property to be paid for upon that basis and measurement at $1 gold per

acre hereinbefore mentioned. A translated copy of said original contract between Kraft and Don Alberto Terrazas, together with a modification thereof dated May .8, 1907, are hereto attached marked 'Exhibits A and B,' respectively, and made a part of the agreement.

"It is mutually agreed and understood and entered into as a part of this contract that the land hereinbefore mentioned and referred to is the same land that was recently inspected by T. S. Masterson, Mark Miller, and S. Bush and ——— Birch. It is hereby guaranteed unto said parties of the second part by all of the above parties named herein, the guaranty being to the extent of the return of the money paid if it should be determined that it is not the same land. If the first parties or any of them fail to fully perform their agreement or any of them herein made, forfeiture of the $10,000 earnest money shall not, be claimed."

This contract is signed by Alf. H. Kraft, J. O. Ross, and H. Masterson, and following the signatures is this sentence: "We concur in the foregoing contract and hereby join in the same and ratify and approve it"— which is signed "Alberto Terrazas" and "John R. Fulkerson."

Exhibit A, which is attached to the contract, is a translated copy of the option sale referred to in the contract. Also the foregoing letter of Alberto Terrazas to Alfred Kraft is attached. None of these contracts was sworn to by any of the parties before an officer 'or notary public authorized to take acknowledgments. The said contracts were executed in triplicate, all three being signed by Alfred H. Kraft, J. O. Ross, H. Masterson, and John Fulkerson in the city of El Paso. On the night they were signed two of the contracts were given to Mr. Ross and he was to forward them the next day from El Paso to Banco Minero, with a check for $10,-000, and thereupon he wrote said bank the following letter: "El Paso, Texas, May 8th, 1907. Banco Minero, Chihuahua, Mexico— Gentlemen: Inclosed please find duplicate 'originals ·of contract between the parties therein named, together with check for $10,-000 in favor of Don Alberto Terrazas, which check you will please deliver to him 'upon his execution of his concurrence in the two contracts herein inclosed. You will please then kindly return to J. O. Ross and H. Masterson, at Houston, Texas, one of said contracts, and deliver the other with the check to Don Alberto Terrazas. Very truly yours, H. Masterson, for himself ·and J. O. Ross." Terrazas duly signed said contracts and· received the $10,000, retaining one ·of them and delivering the other to Banco Minero, which by due course of mail was returned to plaintiffs duly signed by Terrazas.

Sixth. Plaintiffs, in accordance with the contract, remitted $40,000 gold to the Banco Minero, through the Guaranty Trust & Banking Company of El Paso, Tex., said bank remitting the same with a letter, which is as follows: "El Paso, Texas, May 7th, 1907. Banco Minero, Chihuahua, Mexico—Gentlemen: We inclose herewith our check for $40,000, payable to the order of yourself. You will please place this amount to the credit of Messrs. Ross & Masterson, Houston, Texas, which amount is to be turned over to Alberto Terrazas when he complies with his part of the contract between himself and Messrs. Ross and Masterson and others. The Union Bank & Trust Company, of Houston, inform us that they have written you full instructions regarding this matter, and we comply with their instructions in the letter. We hope you will be · able to leave this amount with us for a while, as we were instrumental in getting this deal closed. Yours truly, Guaranty Trust & Banking Company, W. E. Tooley, Cashier."

On the 31st day of May, 1907, the Banco Minero executed a receipt for said $40,000 to Messrs. Ross & Masterson, which was forwarded to them at Houston, Tex., by mail, and is as follows: "Chihuahua, Mexico, 5–31–07. Messrs. Ross & Masterson, Houston, Tex.—Received forty thousand dollars subject to payment Alberto Terrazas when transfer land is made. Banco Minero."

Seventh. In accordance with said contract, the land therein contracted for was surveyed in July and August, 1907, by E. E. Peppercorn, a surveyor, Jose Arguilles and Enrique Carrion, with a number of helpers. Peppercorn, in making the survey, represented the plaintiffs and Jose Arguilles and Enrique Carrion represented Fulkerson, Kraft, Terrazas, and Carrillo.

Eighth. The land which was mentioned in said contract and agreed to be sold to the plaintiffs Ross and Masterson was not the same land which had been shown to and inspected by T. S. Masterson, Mark Miller, S. Bush, and ——— Birch, and it not being the same the contract of sale was breached and violated by the vendors Alberto Terrazas, Lauro Carrillo, Alfred H. Kraft and John R. Fulkerson and by reason of such breach it was the duty of Banco Minero to return the $40,000 deposited in said bank by the plaintiffs as above stated. By reason of the breach of said contract the plaintiffs Ross and Masterson were not bound to pay for the land contracted to be conveyed to them, as before stated.

Ninth. J. O. Ross was the owner of and furnished two-thirds of the $50,000 so paid and deposited in accordance with said contract, and the plaintiff H. Masterson was the owner of the remaining one-third so paid and deposited, and if the sale had been consummated were to own the same in proportion to the amount of money furnished by each; that is, Ross was to be the owner of two-thirds interest therein, and H. Masterson the owner of the remaining one-third interest.

Tenth. Each plaintiff was for many years

prior to the execution of the contract sued on, a resident citizen of the United States of America and of the county of Harris of the state of Texas, and has continuously been a resident citizen of said county and state of the United States of America down to and including the time this case was tried.

Eleventh. About the time the survey of the land was completed plaintiff received an anonymous letter stating that the vendors in said contract were not selling the land that was pointed out to and inspected by T. H. Masterson, Mark Miller, and S. Bush. Upon receipt of the letter the plaintiffs wrote to Alberto Terrazas advising him of the fact of the letter and requesting that no further expense be incurred until the truth of the letter could be ascertained. Thereafter, the men who had inspected said land, as mentioned in the contract, returned to the land, and ascertained that the land inspected by them was not embraced in the Lauro Carrillo grant of land, which, under said contract, was to be sold to plaintiffs.

Twelfth. In November, 1907, plaintiffs went to Chihuahua and had an appointment with Alberto Terrazas, and told him that they were ready to close up the deal, pay over the money, and execute the notes called for in the contract sued on, if he could deliver the land contracted for. Terrazas admitted that he could not deliver the land that was inspected by the parties referred to in the contract sued on, as he did not own the same, and there was nothing to do but for him to return the $50,000 paid by plaintiffs and cancel the matter, and that he would in two weeks thereafter return the $50,000 to plaintiffs. Terrazas has never paid plaintiffs the $10,000 received by him from them, nor the $40,000 deposited by plaintiffs with the Banco Minero under the said contract, or any part thereof, nor has the Banco Minero ever paid back to plaintiffs the $40,000 deposited by them, or any part thereof.

Thirteenth. On January 25, 1908 plaintiffs made a demand on the Banco Minero for the return to them of the $40,000 deposited with it under said contract, but it refused to pay the same to plaintiffs.

On the 14th day of August, 1908, Alberto Terrazas, for himself and as attorney in fact for Lauro Carrillo, Alfred H. Kraft, and John R. Fulkerson, instituted suit against plaintiffs herein, J. O. Ross and H. Masterson, in the Second Civil Court of Iturbide district, in the city and state of Chihuahua, republic of Mexico to enforce the specific performance of the written contract hereinbefore mentioned, entered into by Alberto Terrazas, Alfred H. Kraft and John R. Fulkerson of the first part and J. O. Ross and H. Masterson of the second part, wherein the parties of the first part agreed to sell to said Ross and Masterson the certain lands mentioned in said contract, which suit resulted in a judgment decreeing specific performance of said contract and adjudged an order to Banco Minero to pay over to said Alberto Terrazas the $40,000 deposited with it by plaintiffs herein, under and by virtue of said contract under which this defendant received and held said money. The suit was an action in personam, and not in rem, and the Banco Minero was not a party thereto, or to the judgment therein rendered, nor did it appear in the suit, file any answer therein, nor was it served with any process, writ, or order of the court in said cause prior to and up to the rendition of said judgment. The money deposited with the Banco Minero was not seized by any writ, order or process of the court, or in any way brought into its custody or impounded. The plaintiff herein, H. Masterson, appeared in said suit by his attorney and made defense to the action, but the plaintiff J. O. Ross was never served with any writ or process of any character, the only service had on him being by publication of the suit in the official journal of the court published in the city of Chihuahua, republic of Mexico, and a notice of the suit posted at the courthouse door in the city of Chihuahua in said republic, and as to him the judgment was rendered by default. After the judgment in that case was rendered, the judge of said court issued an order to the Banco Minero, which is in part as follows: "I address you the present note, in order that you be pleased to comply with my ruling of the 22nd of this month in the execution of the judgment to turn over to Licenciate Jose A. Yanez, attorney for Mr. Terrazas, the aforesaid $40,000.00 American gold, to which I make reference. Liberty and Constitution, Chihuahua, March 29, 1909. [Signed] C. Gorostieta Rubrics. Addressed to the Manager of Banco Minero of Chihuahua, present."

Fifteenth. On March 30, 1909, the Banco Minero, under said order and in accordance with instructions of the attorney Jose A. Yanez for plaintiff Alberto Terrazas in said suit, transferred on the books of the bank the $40,000 deposited by the plaintiffs in this suit to the credit of Alberto Terrazas. Subsequently Terrazas drew out said money from the bank by checks and none of the money is there now.

Sixteenth. On January 25, 1908, plaintiffs J. O. Ross and H. Masterson made a legal and proper demand on the Banco Minero and its proper officers for the return to them of the $40,000 deposited by them with the said bank, and the bank refused to accede to their demand, thereby converting the money to its own use and benefit, and has never returned the same or any part thereof to plaintiffs or either of them.

Seventeenth. The order, by virtue of which the Banco Minero transferred said $40,000 to the credit of Terrazas on its books was issued after the rendition of the judgment by the Mexican court against Ross and Mas-

terson, without said Banco Minero being a party to the suit, and without any appearance in said suit by it; and when so transferred on the books had not been impounded by the court nor put in its custody by any writ, order, or seizure, and it was paid to Terrazas without the Banco Minero ever notifying plaintiffs either of the order or of the payment or transfer of said money on its books to the credit of Terrazas, and without informing plaintiffs that they had paid the same to Terrazas on checks drawn by him on it.

Eighteenth. On October 27, 1908, plaintiffs in this suit, J. O. Ross and H. Masterson, in accordance with law, applied for and obtained the issuance of a writ of garnishment in this suit against the Guaranty Trust & Banking Company, a corporation organized under the laws of Texas, which has its principal place of business in El Paso county, Tex., which writ was on the same day duly served on said company in accordance with law and on the 2d day of November, 1908, the said garnishee filed its answer in the district court, wherein this suit was then pending, admitting that it was indebted to the defendant, the Banco Minero, in the sum of $7,500, subject to a credit of $1,343.60, and that the Banco Minero was owner of 1,057 shares of the capital stock of said garnishee, the Guaranty Trust & Banking Company, of the value of $105,700.

Nineteenth. Under the laws of Mexico a judgment rendered in a foreign country against a citizen of that republic by default or without personal service or process upon such citizen will not be respected or enforced by the courts of that republic.

In the view we take of this case, which will be fully exposed in our conclusions of law, many of the matters involved in the foregoing conclusions are neither pertinent nor essential to the validity of the judgment appealed from. Such matters we have, in deference to the very able trial judge, included in our findings, as they may induce a different view from ours by the Supreme Court regarding their effect upon the judgment under consideration.

## Conclusions of Law.

1. The first assignment of error complains that the court erred in overruling appellant's plea to its jurisdiction. The propositions under this assignment are:

(1) "The court below, in which this cause was tried, was without jurisdiction to hear and determine the same when the issue to be determined was in effect the title to land located in a foreign country and to money situated in said foreign country, placed there by a contract to be performed in such foreign country, the action being in effect local in said foreign country and not a transitory action."

(2) "The issues involved in this case cannot be tried without passing on and determining the title to said land and said money, which could not be effected by an adjudication of said court below."

In its conclusions of law the trial court held that it had jurisdiction of the person of the Banco Minero and of the subject-matter of this suit upon three grounds: (1) That defendant made its personal appearance and filed its answer in the case, thereby submitting itself to the jurisdiction of the court; (2) that the garnishment proceedings, which had the effect of impounding in this court the money and property of defendant, conferred jurisdiction; (3) because the action is transitory.

[1] The holding of the court as to its jurisdiction over the person of the Banco Minero on the first ground is supported by the following authorities: York v. State, 73 Tex. 651, 11 S. W. 869; Pace v. Potter, 85 Tex. 474, 22 S. W. 300; Bowman v. Flint, 37 Tex. Civ. App. 28, 82 S. W. 1049; Piano & Organ Company v. Griffin, 41 Tex. Civ. App. 76, 90 S. W. 884; Southern Pacific Company v. Blake, 128 S. W. 669; Land & Trust Co. v. Cumley, 132 S. W. 889.

[2] The cases of C., R. I. & P. R. R. Co. v. Sturm, 174 U. S. 710, 19 Sup. Ct. 797, 43 L. Ed. 1144; Harris v. Balk, 198 U. S. 215, 25 Sup. Ct. 625, 49 L. Ed. 1023; Berry v. Davis, 77 Tex. 191, 13 S. W. 978, 19 Am. St. Rep. 748; M., K. & T. R. R. Co. v. Swartz, 115 S. W. 275, are authority for the second ground. But whether funds of a nonresident defendant, who has only been served constructively, and has not entered an appearance in the case, seized by garnishment proceedings, will support an execution or order of sale on property of the defendant other than such as is impounded by such proceeding, is a question which, in view of the personal appearance of the defendant in this case, we need not determine.

[3] It is elementary that the conversion by one of another's personal property is a trespass for which an action will lie anywhere jurisdiction of the person of the tortfeasor may be obtained, such action being transitory. 2 Wharton on the Conflict of Laws (3d Ed.) 478a; Stone v. U. S., 167 U. S. 182, 17 Sup. Ct. 778, 42 L. Ed. 128; Minor's Conflict of Laws, § 192; Southern Pac. Co. v. Dusablon, 48 Tex. Civ. App. 203, 106 S. W. 766; Lorenzen's Cases of Conflict of Laws, 497. This sustains the third ground of the court's conclusion, and requires the assignment and propositions thereunder to be overruled.

[4] 2. The second assignment of error is as follows: "The court erred in overruling and not sustaining the defendant's general demurrer to plaintiffs' original petition and in rendering judgment for the plaintiffs, because said petition showed no cause of action, it appearing from said petition: That plaintiffs were residents of Houston, Harris County, Tex., that the defendant Banco

Minero, was a foreign corporation, created and existing under and by virtue of the laws of the republic of Mexico, and was not a citizen of the state of Texas nor of the United States of America and that the Banco Minero had no office or agent in the state of Texas. That the cause of action sued on and set up in plaintiffs' petition arose wholly within the republic of Mexico and state of Chihuahua, and that under the contract and cause of action pleaded by plaintiff, the contract under which the money sued for was deposited with the Banco Minero in the city of Chihuahua and state of Chihuahua was to be performed wholly within the state of Chihuahua, republic of Mexico, and the money deposited was to be held by the Banco Minero under and subject to the laws of that state and to be paid over to the party or parties entitled to the same by the Banco Minero, not within the state of Texas, but in the city of Chihuahua, state of Chihuahua, republic of Mexico, and at no other place, and that the action herein sought to be maintained against the defendant for the recovery of said money is local and triable only in the state of Chihuahua and is not transitory and triable in the state of Texas."

Under it this proposition is asserted: "The action appearing on the face of the petition to be a local action triable only in a foreign country, in the state of Chihuahua, republic of Mexico, showed no cause of action triable in said court."

What we have said in considering the preceding assignment of error, and the authorities cited, effectually disposes of this proposition as well. For if, as there held, the cause of action disclosed by plaintiffs' petition is transitory, it cannot be local.

[5] 3. The third assignment also complains of the court's overruling defendant's general demurrer to plaintiffs' petition. Under it this proposition is advanced: "This cause being a local action only triable in the state of Chihuahua, republic of Mexico, could not be tried by a court in the state of Texas, in which cause Alberto Terrazas was a necessary party."

The proposition is based upon the false assumption that the action is local and not transitory, and is disposed of by exposing such fallacy. This suit is against the Banco Minero to recover damages for the conversion of money deposited with it by plaintiffs for an express purpose, and for no other, and its appropriation being by the bank to an entirely different purpose, we can perceive no reason why Terrazas should be held to be a necessary party to this suit. The plaintiffs did not want or ask anything in the suit from him. What they wanted was their money, which they had deposited as aforesaid with the defendant upon certain express conditions made at the time of the deposit, which conditions they claim defendant ignored and converted the money so deposited.

If defendant, as the facts show, allowed Terrazas to draw out the money, contrary to the stipulations upon which it was deposited and held by the bank, and desires in case of a recovery by plaintiffs to recover over against Terrazas, it should have made him a party to the suit. Having failed to do so, it has no ground to complain that he was not made a party defendant by plaintiffs.

[6] 4. This assignment complains of the court's admitting, over defendant's objection, the following testimony of H. Masterson: "I think it was in the early part of 1907 Mr. Miller of this place came over to Houston where Mr. Ross and myself resided, and said he had an option, together with J. Y. Baskin and Dr. Swain with Alberto Terrazas and a man named Lauro Carrillo for the sale of a tract of land of about 100,000 to 130,000 acres of timber land in Chihuahua. He represented it in very glowing colors, saying it would cut an average of 4,500 feet to the acre, that it was grazing land and good grazing land, and was well watered and suitable for pasture purposes in addition to its timber values. That it could all be had for $1.25 Mexican money per acre."

The objections were that it appears from the pleadings and evidence that the parties entered into a written contract for the sale and purchase of the land, and that such contract was plain and unambiguous and cannot be explained, added to, or varied by oral testimony, and that the negotiations and transactions prior to and leading up to the contract could in no way affect the right of defendant, as it was not a party to, nor had anything to do with such negotiations, and that all these matters between Ross and Masterson and Terrazas and Fulkerson and others had been litigated and determined by the courts of Mexico, and such testimony was inadmissible against defendant for any purpose.

We are unable to perceive the relevancy of this testimony to any issue made by the pleadings or that could arise in this case between plaintiffs and the defendant. Defendant's liability for the conversion of the money did not depend upon any question of fraud that might have arisen as between themselves regarding the contract for the sale of the land, but depended primarily upon the conditions stipulated by plaintiffs to defendant when the $40,000 sued for was deposited with its bank. But the fact that the matters relating to the contract of sale, as between the parties thereto, had been adjudicated did not, unless the judgment or decree rendered was such as to protect the Banco Minero against the payment of the money so deposited to Terrazas by showing that he had a right to it under the contract notwithstanding the conditions under which the deposit was made, in any way affect the merits of this case.

[7] The same principle applies to the ad-

mission of the testimony complained of, respectively, in the fifth, sixth, seventh, eighth, nineth, tenth, eleventh, twelfth, thirteenth, fourteenth, sixteenth, and seventeenth assignments which was admitted over like objections made by the defendant; for the testimony in each and all of them was res inter alia, and could in no way affect the defendant nor any real issue in this case. But the errors in admitting such testimony, the case having been tried without a jury, will not affect the judgment, if such evidence as was properly admitted is sufficient to support it.

5. The nineteenth assignment of error complains of the court's finding in its first conclusion of fact, which we have adopted, that Alberto Terrazas gave a written option to T. H. Swain for the sale of 120,000 acres of land belonging to Lauro Carrillo and Terrazas in accordance with the letter of said Terrazas of date April 16, 1907, upon the ground that there was no evidence properly before the court upon which to base said conclusion.

[8] Without pausing to consider whether the finding complained of was without evidence to support it, it may be conceded, for the purposes of this case, that the finding was without evidentiary support; but, inasmuch as the real contract of sale which induced plaintiffs to deposit the $40,000 with defendant was signed by Terrazas for himself and Carrillo and was acted upon by them both, it can make no difference in so far as the merits of this case are concerned whether the finding of the court complained of was right or wrong, for it in no way affected defendant's liability on the question of its wrongful conversion of the money so deposited. This disposes of the twentieth assignment of error as well.

6. The twenty-first, twenty-second, twenty-third, twenty-fifth, twenty-seventh, twenty-eighth, and twenty-ninth assignments of error, which respectively complain that the court erred in its conclusions in finding as a fact (1) that the land mentioned in the contract executed by A. H. Kraft, J. O. Ross, H. Masterson and John Fulkerson was not the same land that was shown the inspectors T. S. Masterson, Mark Miller, and S. Bush, and for that reason the contract was breached by the vendors Terrazas, Carrillo, Kraft, and Fulkerson; (2) that two-thirds of the $50,-000 paid on the contract was the property of J. O. Ross and one-third was the property of H. Masterson, and that if the sale had been consummated Ross would have owned two-thirds and Masterson one-third of the land; (3) that the men who inspected the land mentioned in the contract returned to the land and ascertained that the land they had really inspected was not embraced in the Lauro Carrillo grant, which under the contract was to be sold to plaintiffs; (4) that plaintiffs made demand of the Banco Minero for the return of the $40,000 deposited with it under said contract; (5) that the money deposited by plaintiff with Banco Minero was not seized by any writ, order, or process of the court, impounded or in any way brought into its custody; (6) that J. O. Ross and H. Masterson made a legal and proper demand on the Banco Minero and its proper officers for the return to them of the $40,000 deposited by them with said bank; (7) that under the laws of Mexico a judgment rendered in a foreign country against a citizen of Mexico by default or without personal service or process will not be respected or enforced by the courts of that country, have already been disposed of adversely to appellant by our conclusions of fact. We will observe, however, that some of the conclusions, against which these assignments are directed, are rather of law than of fact and that the principles upon which they are founded will be enunciated before concluding this opinion.

[9] 7. The thirtieth assignment of error is directed against the trial court's first conclusion of law in holding that it had jurisdiction of the Banco Minero and the subject-matter in controversy, in that the undisputed evidence shows that it was a foreign corporation domiciled in the state of Chihuahua, republic of Mexico, and the subject-matter of the suit was not within the jurisdiction of this state.

This proposition is presented under the assignment: "This cause of action arising under a contract in reference to land and a distinct fund deposited and situated in the state of Chihuahua, the deposit being made in pursuance of a contract for sale of the land and as a part of the purchase price, and the contract being one to be performed wholly within that state and in accordance with its laws, the action was local and triable only in the state of Chihuahua, and it required a decree of the courts of Chihuahua to enforce or disaffirm said contract and to effectually determine the title to the deposit as well as the title to the land."

The proposition shows clearly that the character and purpose of this action is entirely misapprehended. The suit is simply to recover damages from the defendant for converting a certain sum of money belonging to plaintiffs, which they had specially deposited with it under a definite understanding for a designated purpose, the measure of damages being the value of the money with interest from the date of its alleged conversion. The contract between plaintiffs and the other parties in regard to the sale of the land mentioned in our conclusions of fact had nothing whatever, that can be seen by the eye of the law, to do with it. This action is beyond doubt in personam, pure and simple. It possesses not a single characteristic of a local action such as is recognized either by the laws of Texas or by private international law as it is understood by the great family of civilized nations. That the

Banco Minero is a foreign corporation domiciled in a foreign country has nothing in the world to do with the question of jurisdiction. Under the common law, which is the great source, of our judicial decisions, a defendant cannot in an action in personam, as distinguished from one in rem, elude a possible judgment by pleading his position as a foreigner. The greatest mandate of this system of jurisprudence is that justice be freely accessible to foreigners; that they shall enjoy in this respect perfect equality with natives; in short, that one's status as a foreigner shall never cause the failure of a suit brought before the proper court or be the means of his escaping a responsibility or liability which he has properly incurred. 18 Harvard Law Review, 328. If any principle of law is settled and can be said to obtain in every jurisdiction, it is that when a party, though a foreigner, voluntarily submits himself to the jurisdiction of a court having the power to hear and determine the matter in controversy, he is concluded by its judgment or decree when rendered. Therefore, this action being in personam, as distinguished from one in rem, and the defendant having voluntarily submitted itself to its jurisdiction it cannot successfully contend that the court was without jurisdiction in the case. The conclusion of the trial court complained of by the assignment, in view of the nature of this action and the voluntary appearance of defendant before it, cannot be gainsaid. See authorities cited under the first of these conclusions.

8. The thirty-first assignment is: "The court erred in its second conclusion of law in holding that the said J. O. Ross had never been served with process, the undisputed evidence showing that J. O. Ross during the time citation to him was being duly and regularly published in the state of Chihuahua, republic of Mexico, in accordance with the laws of said state, was in fact within said state of Chihuahua, republic of Mexico, knew of the pendency of said suit and of the publication of said citation to him in accordance with the laws of the republic of Mexico, and the court erred in holding that said judgment was rendered in a personal action and void as to said plaintiff, J. O. Ross, because said judgment was a judgment quasi in rem and not in personam, said judgment being a judgment in favor of Terrazas and others for a specific fund on deposit within its jurisdiction."

And the propositions under it are: (1) "The finding of the court that J. O. Ross had never been served with process—and that the judgment was, therefore, void, is predicated on a finding against the evidence. The evidence and judgment show that said J. O. Ross was duly cited by publication, according to the law of Chihuahua." (2) "Judgment rendered on citation by publication was valid in the state of Chihuahua, Mexico." (3) "Said Ross being in the state of Chihuahua during the time said citation was being published, knowing that fact, such publication constituted personal service on him, according to the law of that state." This assignment goes to the validity of the judgment rendered in the suit referred to in the thirteenth conclusion of fact, and as to its efficiency as a defense to this action. It assumes that, if the judgment is valid in the jurisdiction where rendered, full force and credit should be given it by our courts, regardless of the force it would have, had it been rendered here. This assumption, as will be shown, does not accord with our understanding of the effect of a foreign judgment when pleaded as a cause of action or a defense in a suit brought in the courts of foreign jurisdiction. But we will consider first the question of its validity and then of its efficacy as a defense to plaintiffs' suit.

[10] In determining the question of the validity of a judgment, the first inquiry is as to the jurisdiction of the court by which it was rendered. To judgments in personam, as distinguished from those in rem, jurisdiction of the person against whom rendered is absolutely essential. No matter where or who he may be—whether a citizen or alien, rich or poor, high or low, black or white—before he can be legally deprived of one dollar's worth of property, whatever may have been his delinquencies, by the judgment of any court under the sun, jurisdiction of his person must in some way be obtained.

In the case of Pennoyer v. Neff, 95 U. S. 714, 24 L. Ed. 565—a case now universally followed by the courts of this country—where the service on the defendant was, as in the case referred to in which the judgment rendered in Mexico is here pleaded by defendant in bar of this action, was, as to Ross, constructive, the court said: "If, without personal service, judgments in personam, obtained ex parte against nonresidents and absent parties, upon mere publication of process, which, in the great majority of cases, would never be seen by the parties interested, could be enforced, they would be the constant instruments of fraud and oppression. Judgments for all sorts of claims upon contracts and for torts, real or pretended, would be thus obtained, under which property would be seized, when the evidence of the transaction upon which they were founded, if they ever had any existence, had perished. * * * When the entire object of the action is to determine the personal rights and obligations of the defendants, that is when the suit is merely in personam, constructive service in this form upon a nonresident is ineffectual for any purpose." But the contention of the appellant is that the suit referred to was not merely in personam, but that it was local in its character.

[11] It is spoken of by counsel for either party as what is known in this country as an equitable action to enforce specific performance for the sale of land, and will be

so considered by us in determining whether it was an action in personam. Nothing is better understood than that, as administered under our system of jurisprudence, equity acts directly upon the person of the defendant, by laying its forceful hand upon him and compelling him to do what in equity and good conscience he should have done.

[12] Viewing this matter from the standpoint of our own courts, it seems beyond question that the sole object of the suit referred to was to determine the personal rights and obligation of the defendant and that it was, therefore, merely a suit in personam. See Miller v. Rusk, 17 Tex. 170; Lucas v. Patton, 49 Tex. Civ. App. 62, 107 S. W. 1143; Cavin v. Hill, 83 Tex. 75, 18 S. W. 323; Hearst v. Kuykendall, 16 Tex. 327.

[13, 14] "Where the subject-matter is situated within another state or country, but the parties are within the jurisdiction of the court, any suit may be maintained and remedy granted which directly affects and operates upon the person of the defendant and not upon the subject-matter, although the subject-matter is referred to in the decree and the defendant is ordered to do or to refrain from certain acts toward it, and it is thus ultimately, but indirectly affected by the relief granted." Pom. Eq. Jur. § 1318. This rule obtains in the United States courts, the state courts of the American Union, and is a settled doctrine in England. Pom. Eq. Jur. § 298. The leading English case is Penn v. Lord Baltimore, 1 Ves. Sr. 444, 2 Lead. Cas. Eq. (4th Am. Ed.) 1806,, where the subject is fully discussed and conclusions are reached in accordance with the text quoted, and the leading American case on the subject is Massie v. Watts, 6 Cranch, 148, 3 L. Ed. 181, where the rule laid down is as follows: "When the defendant is liable either in consequence of the contract, or as its trustee, or as holder of a legal title acquired by a species of mala fides practiced on the plaintiff, the principles of equity give a court jurisdiction wherever the person may be found and the circumstance that a question of title may be involved in the inquiry and may even constitute the essential point on which the case depends does not seem to be sufficient to arrest the jurisdiction in case of fraud, of trust or of contract. The jurisdiction of a court of chancery is sustained wherever the person may be found, although land not within the jurisdiction may be affected by the decree." See, also, Lindley v. O'Reilly 50 N. J. Law, 636, 15 Atl. 379, 1 L. R. A. 79, 7 Am. St. Rep. 802; Lynde v. Columbus C. & I. Ry. Co. (C. C.) 57 Fed. 993; Smith v. Davis, 90 Cal. 25, 27 Pac. 27, 25 Am. St. Rep. 94; Johnson v. Gibson, 116 Ill. 302, 6 N. E. 205; De Klyn v. Watkins, 3 Sandf. Ch. (N. Y.) 185; Davis v. Morris, 76 Va. 21.

Suits for specific performance of contracts are within this rule. Municipal Inv. Co. v. Gardiner (C. C.) 62 Fed. 954; Montgomery v. U. S. (C. C.) 36 Fed. 4; Penn v. Hayward, 14 Ohio St. 302; Epperly v. Ferguson, 118 Iowa, 47, 91 N. W. 816; Brown v. Desmond, 100 Mass. 267; Pingree v. Coffin, 12 Gray (Mass.) 288; Pom. Eq. Jur. § 1317.

"Equity decrees ordinarily act only in personam and can therefore in general have effect only as against parties duly served with process within the territorial jurisdiction of the court. It is competent, however, for a state to provide methods for the determination of title to land within its borders, and in the exercise of such power it may give the equity decrees relating to or affecting the title to land the effect of judgments in rem which therefore may be based upon service of process by publication. 'It is true that in a strict sense a proceeding in rem is one taken directly against property and has for its object the disposition of the property without reference to title of the individual claimants; but in a larger and more general sense the terms are applied to actions between parties where the direct object is to reach and dispose of property owned by them or some interest therein. Such are cases commenced by attachment against the property of debtors or instituted to partition real estate, foreclose a mortgage or enforce a lien. So far as they affect property in the state they are substantially proceedings in rem in the broader sense. * * *' Statutes in these states (as in Texas) make an equity decree equivalent to a conveyance. As a result of statute, it is held in many states that a decree removing the cloud from or quieting title to land within the jurisdiction may be based upon publication of summons. Likewise a decree for specific performance, acting upon the land itself, may issue upon such service." Pomeroy's Equitable Remedies, vol. 1, § 15.

[15-18] In the absence of such statutes as referred to in the quotation, where the property has not been attached or impounded by some judicial process so as to place it in custodia legis and subject it to a decree, equitable decrees can only act in personam, and are absolutely void as against a party who has only been served by constructive process or has not personally appeared in the case. But in the state of Chihuahua, republic of Mexico, there is a statute providing for service by publication such as we have in this state which is shown to have been complied with by the court in Chihuahua which rendered the judgment or decree, the effect of which is now under consideration. It is on this ground that counsel for appellants seek to differentiate that case from an action in personam and fix upon it the character of an action in rem. We do not think that this can be done. That the land was situated within the jurisdiction of the court which rendered the judgment and that a portion of the money was also on deposit in a bank in the state of Chihuahua for the purpose designated in the contract

sued on in that case, the money not being impounded or brought into the custody of the court to be subject to the judgment prayed for, did not change the character of the action from one in personam to one in rem, even in the most liberal sense of the latter term. The title to the land which was the subject of the contract was not disputed by the defendants, but recognized to be in the plaintiffs in that action. The question at issue was simply the identity of the land. If it was that shown them by the parties mentioned in our conclusions of fact as being the subject-matter of the contract, Ross and Masterson were willing to take it and perform their contract, which was to pay a designated price in the manner and at the different periods of time stated therein, and the ultimate object of the suit was to compel them to pay such price. Hence, in so far as any judgment that could be rendered in the case would affect Ross and Masterson, it would be on the money demand. No land that they own or claim title to or possession of situated in Chihuahua, republic of Mexico, could have been affected by it. Money, unlike immovable property, has no situs, but is deemed in law to accompany the person of the owner wherever he goes and his right to it to be governed and determined by the law of the country wherever he may be when a suit to affect his right to it is instituted, and, unless the money is by some lawful means brought within the custody of the court in which the suit is instituted, the action as to him must be regarded as strictly in personam, and if his person is not brought within the jurisdiction of the court by actual as distinguished from constructive service of process, any judgment rendered against him in the suit, unless he voluntarily appears, will be absolutely null and void. It is a generally recognized rule of international private law that "No sovereignty can extend its process beyond its own territorial limit to subject either person or property to its judicial decisions, and every exertion or authority of this sort beyond that limit is a mere nullity and incapable of binding persons or property in other tribunals." Story on Conflict of Laws, § 553. This being so, it is not material what mode of service or process is adopted, for it must be regarded without force, except within the countries whose laws authorize its issuance and service.

[19] If a suit by the vendor on a contract, made by a citizen of this state with a citizen of Mexico domiciled there, for the sale of land situated here at an agreed price, he tendering a deed in accordance with his part of the contract, to recover from the vendee the purchase money agreed upon, were brought in this state, and the only service had on the defendant were constructive, he not appearing in the case, a judgment rendered in favor of plaintiff against him for such purchase money would, whenever the question of validity arose, unquestionably be held by the courts of Texas an absolute nullity; and such, we apprehend would be the holding of the courts of every civilized nation in the world.

[20] We apprehend, however, that, if suit were brought on such hypothetical contract in a court of this state having jurisdiction of the subject-matter by the vendee against the vendor to enforce its specific performance— the plaintiff bringing and tendering into court the purchase money—such action, though the defendant were served only with constructive process, would be regarded in the nature of one in rem rather than in personam—local rather than transitory—and the decree rendered would be taken as self-executing. But mark the difference between such a case and the one first supposed: In the latter the entire subject-matter—the land to be conveyed and the money promised to be paid for it— would be within the jurisdiction of the court, and the decree rendered, being self-executing, would need no process of the court to enforce it, for the whole matter would be at an end, and no court of a foreign jurisdiction would or could ever be called upon to question its validity or effect. But in the first case supposed a pecuniary obligation is imposed on the defendant, without his ever having been given an opportunity to contest the obligation or his liability thereunder; nor was the title or ownership in the land in issue; nor was the judgment rendered self-executing. It could only be enforced by the issuance and execution of final process upon his property situated within the jurisdiction of the court where it was rendered; or by making it the basis for another suit to recover a personal judgment against the defendant in a jurisdiction where personal service could be obtained on him and another judgment rendered, upon which his property could be seized and subjected to its satisfaction. But if used as a basis for such action, the question of its validity would be open to inquiry and, as before intimated, we apprehend that no court in Christendom, for reason that the court which rendered it was without jurisdiction of defendant's person, would sanction it as a basis for such an action.

In the case first supposed the judgment does not affect the land, for the tender of the deed by the plaintiff is his act and not the court's, and the judgment rendered against the defendant is for money and is necessarily in personam; but in the last one it, perforce of our statute, operates on and affects the land only. See Wharton, Confl. Laws, § 289a.

[21] It is thus shown that the judgment rendered against J. O. Ross in the court of Chihuahua, pleaded by Banco Minero as a defense to this action, could ordinarily be given no force or effect in this state, but would be regarded here as a nullity. If, then, it should be conceded that it was valid and operative in the jurisdiction where rendered, it would still be regarded as invalid and inoperative here.

[22] The comity which obtains between foreign governments, upon which the principles of international private law are founded, does not require a state to go further than to give a judgment rendered in a foreign jurisdiction more respect than would be given a like judgment rendered at home. It would be pushing comity away beyond its limits for a state to sanction a wrong done its citizen abroad by recognizing the medium through which the wrong was accomplished as legal, when the means by which it was wrought would be regarded as illegal and inequitable if done within her own territorial limits. An individual may carry his politeness to such an extent as to ignore a wrong done to himself, but a state cannot. The duty she owes to her own citizen forbids that she sanction or give color to a wrong done him in a foreign country through the medium of its laws or courts; but she must, if possible, redress his wrongs and protect him in his rights. Comity reaps no harvest of iniquity in the field of justice.

As to the force and effect of a foreign judgment, in an exhaustive opinion the Supreme Court of the United States in Hilton v. Guyot, 159 U. S. 113, 16 Sup. Ct. 139, 40 L. Ed. 95, says: "In view of all the authorities upon the subject, and of the trend of judicial opinion in this country and in England, following the lead of Kent and Story, we are satisfied that where there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact. The defendants, therefore, cannot be permitted upon that general ground, to contest the validity or the effect of the judgment sued on."

Afterwards, in the same opinion, it is said: "There is hardly a civilized nation on either continent which, by its general law, allows conclusive effect to an executory foreign judgment for the recovery of money. * * * In the great majority of countries on the continent of Europe—in Belgium, Holland, Denmark, Sweden, Germany, in many cantons of Switzerland, in Russia and Poland, in Roumania, in Austria and Hungary (perhaps in Italy) and in Spain—as well as in Egypt, in Mexico, and a great part of South America, the judgment rendered in a foreign country is allowed the same effect only as the courts of that country allow to the judgment of the country in which the judgment in question is sought to be executed. * * * In holding such a judgment, for want of reciprocity, not to be conclusive evidence of the merits of the claim, we do not proceed upon any theory of retaliation upon one person by reason of injustice done to another, but upon the broad ground that international law is founded upon mutuality and reciprocity, and that by the principles of international law recognized in most civilized nations, and by the comity of our own country, which it is our judicial duty to know and declare, the judgment is not entitled to be considered conclusive. * * * In the absence of a statute or treaty, it appears to us equally unwarrantable to assume that the comity of the United States requires anything more." See also Wharton Confl. Law, § 654; Montgomery v. Consolidated Co., 115 Ky. 156, 72 S. W. 816, 103 Am. St. Rep. 302, and note.

[23] It is thus seen that the force and effect that should be given a foreign judgment is not determined by how it is regarded by the courts of the country where it was rendered, but what effect they would give a judgment of the same kind rendered by the courts of a foreign country in which it may be made the basis of an action or a ground for defense. And it also conclusively appears, both from the law and evidence, that if a judgment such as the one in question should be rendered in Texas, that it would be regarded as of no force by the courts of Mexico if sought there to be used to enforce a right claimed under it, and that there, as here, it would be regarded good nowhere and bad everywhere.

9. The thirty-second assignment complains that the court erred in holding that the judgment rendered by the court of Chihuahua "Being judgment against plaintiffs J. O. Ross and H. Masterson, and being wholly void as to plaintiff J. O. Ross, is likewise wholly null and void as to plaintiff H. Masterson."

[24, 25] It is shown from the record that H. Masterson voluntarily appeared and answered in the court of Chihuahua which rendered said judgment. The rule is that jurisdiction of the person may always be given by consent, and whoever voluntarily appears in the courts of a foreign country, whether in obedience to process or otherwise, and submits himself to the jurisdiction is bound by the judgment, though the court could not have bound him in the absence of such action on his part. Tremblay v. Ætna Life Ins. Co., 97 Me. 547, 55 Atl. 509, 94 Am. St. Rep. 535. In view of such appearance in the case by Masterson, it cannot be successfully contended that the judgment as to him is invalid for lack of jurisdiction of the court over his person, or should not be enforced against him in the jurisdiction of the court which rendered it. But this would

not preclude him from urging its invalidity upon other grounds in the courts of this country, for it would be prima facie evidence only of its validity. As the validity of the judgment was contested on other sufficient grounds by proper pleadings, and the court having, upon sufficient evidence, held it absolutely void upon such grounds of contest, the question as to the court's jurisdiction of the person of Ross becomes wholly immaterial, as we shall show in considering other assignments.

10. The thirty-third assignment of error complains of the court's holding that the Chihuahua judgment is "wholly null and void, as being unconscionable, unfair, and unjust as to plaintiffs J. O. Ross and H. Masterson, and, further, because it appears from said judgment that H. Masterson, arbitrarily, without reason or law, was denied an appeal from said judgment to a higher court upon the merits of the case." It will be seen that these findings involve conclusions of fact, as well as law.

We believe the evidence shows that fraud of the grossest character was perpetrated upon these plaintiffs by the parties plaintiff in the case wherein that judgment was rendered; that Masterson was arbitrarily denied the right of an appeal from said judgment; and that the fraud so perpetrated upon them entered into the judgment and became embalmed there, and to strip it of the ingredients of fraud it could not exist.

[26] Since the judgment was void as to Ross for lack of jurisdiction, and Masterson was arbitrarily denied the right of appeal, we need not inquire whether the judgment can be impeached for fraud relating to the merits between the parties. For the latest authorities upon this question see notes, especially "c" and "e," to Tremblay v. Ætna Life Ins. Co., 94 Am. St. Rep. 547–549. The writer, however, has no hesitancy in saying that a judgment, like the one in question, resting alone upon fraud, without any ingredient except fraud, should receive no recognition by the courts of Texas.

[27] We believe the evidence fully sustains the finding of the court that Banco Minero converted the $40,000 of plaintiffs. The money was never seized or brought into court by any process of law; the defendant was not a party to the suit and the money in its hands was not, and could not be, directly affected by the decree. Even after the decree was rendered it was not seized and taken from its custody by any process known to the law; but under an arbitrary order of the judge of the court it was voluntarily transferred by the defendant from plaintiffs' to Terrazas' account on its books, without contesting the validity of the order, which it alone could and should have done for its own protection as well as of plaintiffs' rights in a fund they intrusted to its custody under a definite understanding and for a designated purpose. If a bailee, without invoking the aid of the law to protect him in his rights as a bailee and the bailor's property intrusted to its custody, voluntarily, under an arbitrary and illegal order of a judge, turns the property over to another, under such circumstances as did the Banco Minero, nothing else can be made out of such conduct except "conversion," as the term is used and understood by the law and courts of all civilized countries.

While we have not considered every assignment separately, we believe all have been considered and disposed of in what has been said.

None, we think, presents such an error as requires a reversal of the judgment, and it is affirmed.

### On motion for Rehearing.

While the original opinion states at great length the reasons for our conclusions and copiously cites authorities to sustain them, the sincerity and earnestness of appellant's counsel and the ability evinced in pressing the points contended for upon the court, have induced us to give further expression to our views and cite additional authorities to support them.

That the district court of El Paso county had jurisdiction of this particular case, we believe in view of the authorities cited in the original opinion too clear for argument, But the crucial question is whether the court in Chihuahua, Mexico, had jurisdiction to render the judgment which is pleaded in bar of this action.

The insistence of appellant is that the suit there was an action in rem distinguished from one in personam, in view of which the jurisdiction of the foreign court to render such judgment is apparent from the law.

"The rule is elementary that no sovereignty can extend the process of its courts beyond its territorial limits, or subject either the person or property of a party to its judicial decisions or judgments, when neither he nor his property is within its boundaries. Any attempted exercise of such authority would be beyond the power of the sovereignty to grant, and, as all judicial authority must flow from the state, its grant of power is necessarily defined by its boundaries and no service outside would confer any jurisdiction of the person or property of a defendant so situated." Bank of China v. Morse, 168 N. Y. 458, 61 N. E. 774, 56 L. R. A. 139, 85 Am. St. Rep. 676.

But the evidence shows that the money of the appellees, Ross and Masterson, which was subjected to said judgment, was within the territorial jurisdiction of the court which rendered said judgment, as well as the land for which the money was on deposit as a part of the purchase price. Hence appellant's contention that the action brought by the vendors of the land against these appellees in Chihuahua, did not come within the general rule stated, but fell within its exception, it being in rem and not in personam.

[28] It is undoubtedly the rule that, "As to proceedings in rem, suits to enforce liens or to determine conflicting claims of title, or to recover possession of property, whether real or personal, or to obtain judgment enforceable against property which has been seized under attachment or other mesne process, it is within the power of every state or country to provide methods of serving process which will affect all persons whether residents or not." Note to Alley v. Caspari, 6 Am. St. Rep. 179–190; Arndt v. Griggs, 134 U. S. 316, 10 Sup. Ct. 557, 33 L. Ed. 918; Wehrman v. Conklin, 155 U. S. 314, 15 Sup. Ct. 129, 39 L. Ed. 167.

[29] But while the money of the defendants, appellees here, was within the territorial jurisdiction of the court of Chihuahua, it was not, as found by the trial court, impounded, attached, seized, proceeded against or in any manner or form brought within the custody or control of the court prior to the time the judgment was entered, nor was the judgment against said money. While it has been held, and properly so, in a case that a nonresident can be sued in the courts of this state when he has effects here, without bringing his effects before the court by attachment or some similar process, to await final judgment (Rice v. Peteet, 66 Tex. 568, 1 S. W. 657), it was in a case where jurisdiction of the person of the defendant had been obtained. But we know of no case where it has been held that personal property, though within the territorial bounds of a court's jurisdiction, which has not been impounded or brought before the court by some process to await its final judgment, can be subjected to a personal judgment against its foreign owner, upon whom constructive service only was had and who never submitted his person to the jurisdiction of the court. And we dare say none can be found.

[30] Whichever way that case may be turned and in whatever light it may be viewed we can make nothing out of it except an action in personam. As no personal service was obtained on J. O. Ross, nor his property proceeded against, impounded or brought within the custody of the court, to be subjected to its decree or order, he not having voluntarily submitted his person to the jurisdiction of the court, such judgment was as to him absolutely void. And upon further reflection we have concluded that, notwithstanding his voluntary appearance in the case, it was void as to Masterson also. Our reason for so holding is this: The contract for the sale and purchase of the land was an entirety in which all parties to its execution were necessary parties to a suit to compel its specific performance. To illustrate, one of the vendors of the land could not alone as plaintiff enforce its performance against the vendees as defendants; nor, vice versa, could one of the vendees, without the other, enforce its performance

against the vendors. In other words, all the parties to the contract, both the vendees and vendors, would be necessary to an action for specific performance whether such suit was brought by the vendors or the vendees. And the action, being in personam, it was as essential that jurisdiction of the person be obtained over the person of them all as it was for all of them to be made parties to the suit. Therefore, as jurisdiction was not obtained over the person of Ross, specific performance of the entire contract could not be enforced against Masterson. For he never contracted to take and pay for all the land, nor could he be compelled to take and pay for a part of it. He was entitled under the law to an undivided interest with Ross in every foot of it upon the contract being performed by them, whether voluntarily or perforce of a judicial decree; and without the jurisdiction of the person of Ross having been obtained such a decree could not be rendered. No court in any civilized country will undertake by its decree to make and enforce a contract for any one different from the contract he has made himself, yet this would be the effect of the judgment in question were it held enforceable against Masterson and void as to Ross. Hence, as it is void as to Ross for want of jurisdiction of the court over his person, it is necessarily void as to Masterson.

Just one other matter and we will close this opinion with the assurance that we have given the important questions presented as careful consideration as the limited time at our command admitted of, and with the consolation that if we have in any way erred in our disposition of such questions, such error may be corrected by a higher and abler court. It is contended that the decision of this and the district court's conclusions of fact as to the law of the state of Chihuahua, Mexico is against the weight of the evidence as shown by the written law of that state and the expert testimony adduced upon the subject.

[31] While the question of what the law is in a foreign country in its application to a question under consideration is one of fact, we may be pardoned for quoting from a late authority showing the office of the trial judge regarding the evidence introduced to prove such law, which is this: "The fact that the question is one of law naturally places it, in many points of administration, within the hands of the presiding judge, familiar with the decisions of questions of domestic law. His finding is not absolutely controlled by the testimony of the witness, even when uncontradicted. Thus, the most unequivocal testimony of a skilled witness as to the construction given to the foreign law, cannot control the court's understanding of the meaning of the written law and the plain decisions of the foreign court. In other words, the presiding judge may examine for himself the documents which the skilled

witness refers to as a correct statement of the foreign law, 'not as evidence per se but as part of the testimony of the witness.' That is, the court of the forum is not relieved of the duty of construing the written document as would be imposed in case of any other legal writing even though the work of translation has been performed by a witness familiar with the foreign language. The written document bearing on the foreign law is read to the court; it cannot be read to the jury. A witness will not be permitted to testify to the construction given a statute, if its meaning is regarded by the presiding judge as being perfectly plain, and there has been no official judicial decision." Chamberlayne's Mod. Law of Evidence, § 900.

This being the rule, great weight should be given to the findings of fact by the trial judge as to the law of the state of Chihuahua, Mexico, upon its bearing upon this case. It cannot be said by us as a matter of law that his findings of fact, or any of them are erroneous; for to do so we would have to say that there was no testimony reasonably tending to support them. This we cannot do, especially in a case like this where the burden was upon appellant to show that the decree in the Chihuahua case and proceedings thereunder was a defense to this action. The judge may not have believed a word of the expert witnesses' testimony, nor was he bound to believe it (McCormick v. Kampmann, 109 S. W. 492; Id. 102 Tex. 215, 115 S. W. 24); but could, if he thought the construction placed upon the written law of Chihuahua by the experts was incorrect, ignore it and construe the law himself and determine the effect of the decree and proceedings in question in view of his own construction. This, his ability, long-continued practice as a lawyer and experience as a judge on the boundary line between the states of Texas and Chihuahua, eminently fitted and capacitated him to do.

The conclusion cannot be escaped that Banco Minero lent itself to a fraudulent scheme concocted by and pushed through the courts of Chihuahua by influential citizens of Mexico to wrongfully deprive the plaintiffs in this case, who are citizens of Texas, of money they had deposited with it on conditions which were never fulfilled, by voluntarily, under a void decree, without protest or an effort to protect them in their property, handing it out to one who had not the shadow of a right to one cent of it.

If Banco Minero could not protect appellees in their property by an appeal to the courts of that country, because they were deaf to the cry of justice, it cannot expect the courts of this state to ignore the wrong done its citizens through the medium of such a court by giving verity and sanction to one of its void judgments.

The motion is overruled.