## HANNELORE NICOL, NEE HEIDECKER, v. LAWRENCE E. TANNER.

256 N. W. 2d 796.

August 20, 1976—No. 46063.

*Peterson, Holtze & Treat* and *Fred L. Morrison*, for appellant.

*Christian & Gross* and *Loren Gross*, for respondent.

KELLY, JUSTICE.

Plaintiff appeals from a judgment of the Hennepin County District Court denying enforcement to a German judgment for child support against defendant. We reverse and remand.

Plaintiff, a citizen of the Federal Republic of Germany, obtained a default judgment of paternity and for child support against defendant, then a United States serviceman in Germany, in a court in the Federal Republic of Germany on August 22, 1967. Defendant was ordered to pay 95 Deutschmarks (approximately $29.55) per month in child support, and has made no payments. Plaintiff asks for: (1) Enforcement of the German judg-

ment to the extent of a $1,477.50 arrearage in support payments; (2) an order for $50 a month in future support payments. Defendant denies fatherhood and asserts lack of jurisdiction in the German court and several other matters. The district court denied enforcement of the judgment on the sole ground that plaintiff had not shown reciprocity, i. e., that a German court would enforce a Minnesota support judgment, as required by this court in Traders Trust Co. v. Davidson, 146 Minn. 224, 227, 178 N. W. 735, 736 (1920).

Two issues are dispositive of this appeal: (1) Is reciprocity a prerequisite to enforcement of a foreign country's judgment in Minnesota? (2) Is there any other reason for denying enforcement to the judgment herein?

*The Requirement of Reciprocity*

The district court held that Minnesota law required that the plaintiff show reciprocity before she could obtain enforcement of the German judgment.[1] Its holding was based on dictum in Traders Trust Co. v. Davidson, 146 Minn. 224, 227, 178 N. W. 735, 736 (1920). In that case, plaintiff, as liquidator of an insolvent Manitoba corporation, sought to enforce in Minnesota a judgment obtained against defendant, a Minnesota citizen and shareholder of the corporation, in the Court of King's Bench of

---

[1] Although the parties have not argued the issue, we note at the outset that the Minnesota Reciprocal Enforcement of Support Act, Minn. St. 518.41 to 518.53, appears to be inapplicable to this case. Minn. St. 518.42, subd. 2 defines a "state" as including "any foreign jurisdiction in which this or a substantially similar reciprocal law has been enacted." Therefore, if the Federal Republic of Germany had such a substantially similar reciprocal law, this court might be required to enforce the contested judgment pursuant to the Minnesota Reciprocal Enforcement of Support Act. However, research has not disclosed any such reciprocal law in the Federal Republic. See, The German Civil Code (Fred B. Rothman & Co., trans. Forrester, Ilgen, and Goren 1972).

We are informed by the Treaty Division of the United States State Department that the United States is not a party to any international agreement on the subject of support obligations.

Manitoba. Defendant had never been a citizen or resident of Manitoba, was never served with any process in the action within Manitoba, and never voluntarily appeared in that action. This court refused to permit enforcement of the Manitoba judgment, holding that it was rendered without personal jurisdiction over defendant. It rejected plaintiff's arguments that (1) the giving of a proxy to vote at a shareholders' meeting by defendant was a sufficient basis for jurisdiction; (2) that the Manitoba court's appointment, pursuant to Canadian statute, of counsel for the shareholders gave counsel authority to make a personal appearance on behalf of defendant; (3) that Manitoba law permitted the exercise of in personam jurisdiction over any shareholder in one of its corporations. In restating the general law of foreign judgments, the court wrote:

"Effect is given to foreign judgments as a matter of comity and reciprocity, and it has become the rule to give no other or greater effect to the judgment of a foreign court than the country or state whose court rendered it gives to a like judgment of our courts. Hilton v. Guyot, 159 U. S. 113, 227, 16 Sup. Ct. 139, 40 L. ed. 95. And we may note in passing that in Manitoba a foreign judgment does not conclude the defendant even as to the merits. International Corporation v. Great North West Cent. Ry. Co. 9 Man. 147; British Linen Co. v. McEwan, 6 Man. 292; British Linen Co. v. McEwan, 8 Man. 99." 146 Minn. 227, 178 N. W. 736.

While the above paragraph, read in isolation, might be viewed as an alternative holding, the manifestly jurisdictional flavor of the opinion and the court's emphatic use of jurisdiction as the basis for reversal, 146 Minn. 230, 178 N. W. 738, render any statement on the issue of reciprocity dictum. We therefore remain free to examine the historical underpinnings and modern policy bases of the doctrine of reciprocity.

Any such examination must begin with the case of Hilton v. Guyot, 159 U. S. 113, 16 S. Ct. 139, 40 L. ed. 95 (1895), which

was relied on in Traders Trust Co. The plaintiffs in Hilton, who were the official liquidator and surviving partners of a French firm, had recovered a money judgment for the French equivalent of $195,122.47 against defendants who were United States citizens doing business in France, New York, and elsewhere. The judgment was awarded by the Tribunal of Commerce of the Department of the Seine, a judicial tribunal or court organized and existing under the laws of France, sitting at Paris, and having jurisdiction of suits and controversies between merchants or traders arising from commercial dealings between them. Defendants had fully litigated the matters in dispute in France, and had prosecuted an unsuccessful appeal to the Court of Appeals of Paris. Before the appellate decision, defendants ceased doing business in France and removed their property from that country. Plaintiffs sought to enforce the French judgment in the Circuit Court of the United States for the Southern District of New York. As a part of their defense to the action on the judgment, defendants offered to prove that the French courts would not give conclusive effect to a similar American judgment, but would re-examine the merits according to their doctrine of *révision au fond*. The circuit court rejected this offer and enforced the judgment. On appeal the United States Supreme Court reversed in an extensive opinion on the law of foreign judgments, holding that proof of lack of reciprocity should have been allowed and would have constituted a valid defense to the action on the judgment. The court relied on Story's Conflict of Laws,[2] earlier decisions in

---

[2] The court observed that Story had commended the practice of Holland, quoting him as follows: " '* * * Holland seems at all times, upon the general principle of reciprocity to have given great weight to foreign judgments, and in many cases, if not in all cases, to have given to them a weight equal to that given to domestic judgments, wherever the like rule of reciprocity with regard to Dutch judgments has been adopted by the foreign country whose judgment is brought under review. This is certainly a very reasonable rule, and may perhaps hereafter work itself firmly into the structure of international jurisprudence.' Story's Conflict of Laws, § 618." Hilton v. Guyot, 159 U. S. 113, 212, 16 S. Ct. 139, 162, 40 L. ed. 95, 125.

England and the United States,[3] and a survey of the law in other European nations, to uphold the doctrine of reciprocity as a well-established part of the international law of judgments.[4] From its exhaustive review of the authorities, the court, speaking through Mr. Justice Gray, concluded:

"In holding such a judgment, for want of reciprocity, not to be conclusive evidence of the merits of the claim, we do not proceed upon any theory of retaliation upon one person by reason of injustice done to another; but upon the broad ground that international law is founded upon mutuality and reciprocity, and that by the principles of international law recognized in most civilized nations, and by the comity of our own country, which it is our judicial duty to know and to declare, the judgment is not entitled to be considered conclusive.

"By our law, at the time of the adoption of the Constitution, a foreign judgment was considered as *prima facie* evidence, and not conclusive. There is no statute of the United States, and no treaty of the United States with France; or with any other nation, which has changed that law, or has made any provision upon the subject. It is not to be supposed that, if any statute or

---

[3] Although the court discussed many earlier English and American decisions involving comity, it acknowledged: "This rule [reciprocity] though never either affirmed or denied by express adjudication in England or America, has been indicated, more or less distinctly, in several of the authorities already cited." Hilton v. Guyot, 159 U. S. 113, 212, 16 S. Ct. 139, 162, 40 L. ed. 95, 125.

[4] For a discussion of the early history of the enforcement of judgments in United States, England, and other countries, see Note, 2 Tex. Int. L. Forum 75. The author there concludes that England would give conclusive effect if there was jurisdiction in the foreign court and no fraud, France would deny conclusive effect unless there was a treaty, and Germany would require reciprocity and, at that time, had no treaties. The author also reported that Hilton had confused other jurisdictions as to the United States position on enforceability, and recommended Federal executive or legislative action to remedy the confusion. See, also, Comment, 10 La. L. Rev. 319.

treaty had been or should be made, it would recognize as conclusive the judgments of any country, which did not give like effect to our own judgments. In the absence of statute or treaty, it appears to us equally unwarrantable to assume that the comity of the United States requires anything more.

"If we should hold this judgment to be conclusive, we should allow it an effect to which, supposing the defendants' offers to be sustained by actual proof, it would, in the absence of a special treaty, be entitled in hardly any other country in Christendom, except the country in which it was rendered. If the judgment had been rendered in this country, or in any other outside of the jurisdiction of France, the French courts would not have executed or enforced it, except after examining into its merits. The very judgment now sued on would be held inconclusive in almost any other country than France. In England, and in the Colonies subject to the law of England, the fraud alleged in its procurement would be a sufficient ground for disregarding it. In the courts of nearly every other nation, it would be subject to reexamination, either merely because it was a foreign judgment, or because judgments of that nation would be reexaminable in the courts of France." 159 U. S. 228, 16 S. Ct. 168, 40 L. ed. 130.

Mr. Justice Gray's opinion, however, represented the views of a bare five member majority of the court. Mr. Chief Justice Fuller, joined by Mr. Justice Harlan, Mr. Justice Brewer, and Mr. Justice Jackson dissented, maintaining that principles of res judicata demanded enforcement. The Chief Justice wrote:

"Plaintiffs brought their action on a judgment recovered by them against the defendants in the courts of France, which courts had jurisdiction over person and subject-matter, and in respect of which judgment no fraud was alleged, except in particulars contested in and considered by the French courts. The question is whether under these circumstances, and in the absence of a treaty or act of Congress, the judgment is reexaminable upon the merits. This question I regard as one to be

determined by the ordinary and settled rule in respect of allowing a party, who has had an opportunity to prove his case in a competent court, to retry it on the merits, and it seems to me that the doctrine of *res judicata* applicable to domestic judgments should be applied to foreign judgments as well, and rests on the same general ground of public policy that there should be an end of litigation.

"This application of the doctrine is in accordance with our own jurisprudence, and it is not necessary that we should hold it to be required by some rule of international law. The fundamental principle concerning judgments is that disputes are finally determined by them, and I am unable to perceive why a judgment *in personam* which is not open to question on the ground of want of jurisdiction, either intrinsically or over the parties, or of fraud, or on any other recognized ground of impeachment, should not be held *inter partes*, though recovered abroad, conclusive on the merits." 159 U. S. 229, 16 S. Ct. 168, 40 L. ed. 131.

He concluded:

"I cannot yield my assent to the proposition that because by legislation and judicial decision in France that effect is not there given to judgments recovered in this country which, according to our jurisprudence, we think should be given to judgments wherever recovered, (subject, of course, to the recognized exceptions,) therefore we should pursue the same line of conduct as respects the judgments of French tribunals. *The application of the doctrine of res judicata does not rest in discretion; and it is for the government, and not for its courts, to adopt the principle of retorsion, if deemed under any circumstances desirable or necessary.*" 159 U. S. 234, 16 S. Ct. 170, 40 L. ed. 133. (Italics supplied in part.)

Hilton is directly applicable to the facts here, i. e., a foreign citizen seeks enforcement of a judgment he obtained in his coun-

try against a United States citizen.[5] Hilton and its companion case, Ritchie v. McMullen, 159 U. S. 235, 16 S. Ct. 171, 40 L. ed. 133 (1895) involved appeals from lower Federal courts. Neither of the opinions in these cases expressly indicates that state courts are bound to follow the rule of reciprocity. While this court would be bound to follow Hilton if the holding was based upon Federal constitutional, statutory, or treaty law (and the substantive nature of that law remains the same today), the source of law involved in Hilton was none of these. While Hilton acknowledged that treaty or statute would be the most certain guide for decision in the area of private international law, it found no treaty or statute helpful. 159 U. S. 163, 16 S. Ct. 143, 40 L. ed. 108. It referred instead to "the comity of Nations"[6] and chose to proceed "by the principles of international law recognized in most civilized nations, and by the comity of our own country, which it is our *judicial duty* to know and declare * * *." Applying these principles the court held that the judgment was "not entitled to be considered conclusive."[7] However, lower Federal

---

[5] The Hilton majority indicated that the doctrine of reciprocity was restricted to cases where an action is brought by a foreigner on a foreign judgment against a citizen of the United States. Hilton v. Guyot, 159 U. S. 113, 205, 16 S. Ct. 139, 159, 40 L. ed. 95, 123. As Judge Learned Hand commented in an early case in which despite plaintiffs' argument, it was stated that Hilton had no application: "* * * So far as I know, the doctrine of reciprocity has been confined to foreign judgments alone * * *. Moreover, it is a doctrine in supposed protection of the nationals of the forum. On what theory citizens of a foreign state may invoke it I cannot understand." Direction Der Disconto-Gesellschaft v. U. S. Steel Corp. 300 F. 741, 747 (S. D. N. Y. 1924).

See also, 2 Beale, The Conflict of Laws, § 434.2, p. 1382, note 1. For a more recent case holding that the requirement of reciprocity does not apply when it is sought to enforce a judgment rendered against a party who was not a United States citizen, see Bata v. Bata, 163 A. 2d 493, 505, 39 D. Ch. 258, 278 (1960), certiorari denied, 366 U. S. 964, 81 S. Ct. 1926, 6 L. ed. 2d 1255 (1961).

[6] Hilton v. Guyot, 159 U. S. 113, 163, 16 S. Ct. 139, 143, 40 L. ed. 95, 108.

[7] 159 U. S. 113, 228, 16 S. Ct. 139, 168, 40 L. ed. 95, 130.

courts have indicated that the states are free to adopt rules of their choice and, moreover, that the Federal courts in diversity-of-citizenship cases must apply the rule of the state in which they are sitting. See, Svenska Handelsbanken v. Carlson, 258 F. Supp. 448 (D. Mass. 1966); Somportex Ltd. v. Philadelphia Chewing Gum Corp. 453 F. 2d 435 (3 Cir. 1971), certiorari denied, 405 U. S. 1017, 92 S. Ct. 1294, 31 L. ed. 2d 479 (1972); Toronto-Dominion Bank v. Hall, 367 F. Supp. 1009 (E. D. Ark. 1973). But cf. Banco Nacional de Cuba v. Sabbatino, 376 U. S. 398, 84 S. Ct. 923, 11 L. ed. 2d 804 (1964).

Hilton has been severely and consistently criticized by commentators and courts. Three significant criticisms have been advanced. First, Hilton mandates a misplaced retaliation against judgment creditors for acts of foreign states irrelevant to their cases and over which they had no control. As stated in Reese, *The Status in This Country of Judgments Rendered Abroad,* 50 Col. L. Rev. 783, 793:

"* * * [T]he creditor is not to blame for the fact that the state of rendition does not afford conclusive effect to American judgments, and it might well be thought unfair to rob him on this account of the essential advantages of his judgment."

When a judgment debtor has had his day in court in a foreign forum, his creditor should not be prejudiced in enforcing the judgment thus obtained.[8]

Second, judgments are enforced to bring an end to litigation so that the rights of parties might finally be determined and judicial energies might be conserved. These considerations are thwarted by a reciprocity requirement. The judgment of a foreign nation, when rendered in a proceeding in which the foreign court had jurisdiction and the issues were fully and fair-

---

[8] See also, Leflar, American Conflicts Law, § 74; Golomb, *Recognition of Foreign Money Judgments: A Goal-Oriented Approach,* 43 St. John's L. Rev. 604, 615.

ly adjudicated, should be entitled to no less effect on policy grounds than a judgment of another state or Federal court.[9]

Third, there is serious doubt that Hilton achieves either of its two probable goals: (1) Protecting Americans abroad; and (2) encouraging foreign nations to enforce United States judgments. If protecting American interests abroad was a goal of Hilton, it is clear that reciprocity does not achieve that goal because it does not look to the fairness or persuasiveness of the foreign judgment. Furthermore, as stated in Golomb, *Recognition of Foreign Money Judgments: A Goal-Oriented Approach*, 43 St. John's L. Rev. 604, 616, "while protecting nationals from unfair treatment abroad is a valid exclusive interest of a state, favoring nationals despite fair treatment abroad should not be commended." If encouraging foreign nations to recognize our judgments was the goal, Golomb alleges that its achievement has been almost totally unattained. As Golomb concludes:

"If *Hilton* is regarded as an attempt by the Supreme Court to secure recognition for American judgments abroad, not an unreasonable state interest, the decision has not achieved its desired effect. American judgments fare very badly abroad, even today. Possibly the limited application of *Hilton* to judgments rendered against American defendants in favor of [foreign] nationals, when compared to the sweeping reciprocity policies of other nations, reduces its effectiveness as a means of persuading other states to recognize American judgments. The *Hilton* decision did not induce France to relax in its *révision au fond*. Apparently, the strict reciprocity doctrine of Germany was the motivating factor. Probably more damaging, however, to the fate of American judgments abroad is that foreign nations with reciprocity rules look at *Hilton*, and conclude that the United States would not recognize one of their judgments. The *Hilton* rule then

---

[9] See also, Golomb, *Recognition of Foreign Money Judgments: A Goal-Oriented Approach*, 43 St. John's L. Rev. 604, 617; 2 Beale, The Conflict of Law, § 434.3. This argument in a somewhat more traditional form, appears to be the basis of the four-member dissent in Hilton.

leads American courts to refuse recognition to judgments of those countries. This circularity does not further any of the relevant goals of judgment recognition policies. It would seem that a clear renunciation of the reciprocity doctrine by American courts might be a more effective method of obtaining recognition for American judgments in many other nations." Ibid.[10]

It thus appears that the most enlightened thinking in American law has rejected the doctrine of reciprocity. Both Restatement, Conflict of Laws, 2d, § 98, Comment *e*, and the Uniform Foreign Money-Judgments Recognition Act, 9B U. L. A. 64, do not require reciprocity.

We therefore decline to adopt the doctrine of Hilton and hold instead that reciprocity is not a prerequisite to enforcement of a foreign judgment in Minnesota. It is not the business of the courts, whose province is the decision of individual cases, to impose rules designed to coerce other nations into giving effect to our judgments. Reciprocity has no basis in the policies or rules that underlie the just and fair disposition of a case involving a foreign judgment; accordingly, it should have no place in our law.

*Other Reasons for Denying Enforcement*

There may, however, be other reasons to deny enforcement of the German judgment in this case. Among these are: (1) Lack of jurisdiction; (2) lack of reasonable notice and opportunity to be heard; (3) the default nature of the judgment.[11]

---

[10] See also: Lorenzen, *The Enforcement of American Judgments Abroad,* 29 Yale L. J. 188, 206; Nadelmann, *Non-Recognition of American Money Judgments Abroad and What To Do About It,* 42 Iowa L. Rev. 236.

[11] Other possible grounds, such as fraud (Restatement, Conflict of Laws, 2d, § 115, Comment *f*), that the underlying cause of action was contrary to the public policy of Minnesota (Id. § 117, Comment *c*), or that the German court was not competent or that German law was in some way violated in entering the judgment (Id. § 92, Topic 2. Recognition of Foreign Judgments), were not asserted by defendant below and find no support in the record in this court. Indeed, as to the second pos-

The trial court specifically found that defendant received notice of the action and defaulted. The record bears out this finding, and indicates service of process on defendant by a United States military officer. There would appear to be no reason to question the jurisdiction in the German court. The record is not clear as to why defendant defaulted. There is no support for the contention that he did not have a reasonable opportunity to appear and defend, although that contention was not properly focused on below because of the trial court's decision on reciprocity.

A court should be particularly suspicious of a default judgment in a case such as this. Inquiry should be made below into the nature of service of process, defendant's military status, reason for default, reason why enforcement proceedings were not commenced in Germany while defendant was in the military, etc. It would be helpful to know the underlying facts, particularly since defendant now contends that he is not the father of plaintiff's child and that he signed a confession of paternity while intoxicated.

As a matter of law, however, the default status of the judgment, if reasonable notice and opportunity to be heard were afforded, and other requirements of basic fairness were met, should not affect the force of the judgment. This view is in accord with the approach adopted by the Restatement, Conflict of Laws, 2d. Although § 98 of the Restatement is carefully limited to judgments after a fair trial in a contested proceeding, Comment *d* indicates that default judgments based upon in personam jurisdiction will generally be enforced when the defendant has been given adequate notice and opportunity to be heard and when the other conditions stated in Comment *c* to that section have been satisfied. Comment *c*, citing the conditions to recognition as set

sible ground suggested, it is entirely consistent with Minnesota policy that fathers support their illegitimate children. Minn. St. 518.41 to 518.53; Note, 40 Minn. L. Rev. 283; Scott, *Ten Years with the Runaway Pappy,* 19 Bench and Bar of Minn., March 1962, p. 35.

forth in Hilton, states that a foreign nation judgment will not be recognized in the United States unless the American court is convinced that the foreign court had jurisdiction and that— quoting Hilton v. Guyot, 159 U. S. 113, 202, 16 S. Ct. 139, 158, 40 L. ed. 95, 122 (1895)

"there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting, or fraud in procuring the judgment * * *."

In Cherun v. Frishman, 236 F. Supp. 292 (D. D. C. 1964), the court enforced a default judgment entered by a Canadian court in favor of a resident and citizen of Canada and against a United States citizen residing in the District of Columbia. The court concluded that the conditions enumerated above had been satisfied and held that the jurisdiction of the Canadian court was proper.

In addition, on the subject of enforcement of default judgments, one commentator has remarked:

"* * * Because no prior litigation has occurred except in the most formal sense, it is evident that the avoidance of relitigation in default cases is not a central issue. Instead it seems apparent that the real question is whether the defendant could and should have appeared and litigated in the foreign court. If the answer is yes, the interests of finality are served by recognition, and it does not seem unfair to deprive the defendant of any further opportunity to litigate the merits. 'Could' here encompasses inquiry into the reasonableness and effectiveness of notice and opportunity to be heard in the specific case. 'Should' addresses itself to the appropriateness of the foreign forum, which ought to be tested not by formal rules on the permissible scope of jurisdic-

tion, but rather by considerations of propriety in light of the facts of the dispute at hand and the relationship of the immediate parties to the foreign forum." Peterson, *Foreign Country Judgments and the Second Restatement of Conflict of Laws*, 72 Col. L. Rev. 221, 245.

The "could" and "should" in the above test cannot be accurately determined on this record.

Because the trial court erred in holding that reciprocity was required, we must reverse. On remand, the trial court should make further inquiry into the circumstances underlying the German judgment. If it is satisfied that the judgment is entitled to enforcement based on the principles discussed in this opinion, it should grant enforcement to the extent of the accrued arrearages in support. Cf. Holton v. Holton, 153 Minn. 346, 190 N. W. 542 (1922); Ladd v. Martineau, 205 Minn. 129, 285 N. W. 281 (1939).[12]

Reversed and remanded for further proceedings consistent with this opinion.

---

[12] We express no opinion as to the collateral estoppel effect, if any, of the German judgment or the extent to which it might be vacated or modified in further proceedings. These issues were not passed on in the trial court.