The ROYAL BANK OF CANADA,
Plaintiff,

v.

TRENTHAM CORPORATION,
Defendant.

Civ. A. No. H–79–318.

United States District Court,
S. D. Texas,
Houston Division.

June 2, 1980.

Kelley, Ryan & Merrill, Houston, Tex. (Joseph W. Ryan), Houston, Tex., for plaintiff.

Jon Mercer, Houston, Tex., for defendant.

## MEMORANDUM AND ORDER

STERLING, District Judge.

Pending before the Court is Plaintiff's motion for summary judgment. The Royal Bank of Canada brings this suit for recognition and enforcement of a judgment entered by default in the Court of the Trial Division of the Supreme Court of Alberta, Judicial District of Calgary, on October 11, 1978. On that date a judgment in the amount of $250,000.00 plus interest and costs was entered against Trentham Corporation of Texas. The basis for that lawsuit was a contract of guaranty by which the Defendant agreed to guarantee payment of all liabilities up to $250,000.00 owed by Trentham Canada to the Plaintiff. Defendant resists enforcement of the Canadian judgment based on its contentions that the Canadian court did not have personal jurisdiction over it and that it was improperly served. This Court is of the opinion that there is no genuine issue as to any material issue and that the Royal Bank is entitled to judgment as a matter of law pursuant to Rule 56, Fed.R.Civ.P.

Although the issue has not been resolved by the Supreme Court, most courts have assumed that in cases founded upon diversity jurisdiction between citizens of a state and a foreign country, the rule of *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), applies and state law governs. *Compare Aetna Life Insurance Co. v. Tremblay*, 223 U.S. 185, 32 S.Ct. 309, 56 L.Ed. 398 (1912), *Somportex, Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435 (3rd Cir. 1971), *cert. denied*, 405 U.S.

1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972), *Toronto-Dominion Bank v. Hall*, 367 F.Supp. 1009 (E.D.Ark.1973), and *Compania Mexicana Rediodifusora Franteriza v. Spann*, 41 F.Supp. 907 (N.D.Tex.1941), *aff'd* 131 F.2d 609 (5th Cir. 1942) *with Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), *Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson*, 597 F.2d 1161 (9th Cir. 1979) and *John Sanderson & Co. (Wool) Pty. Ltd. v. Ludlow Jute Co., Ltd.*, 569 F.2d 696 (1st Cir. 1978).

 Under Texas law, as well as that of all the other states, a judgment rendered in a foreign country is not entitled to the full faith and credit accorded the judgments of the courts of the sister states. *See, Dunn v. Tiernan*, 284 S.W.2d 754 (Tex.Civ. App.-El Paso, 1955, writ ref'd n. r. e.). The extent to which a judicial decree of one nation will be allowed to operate within the dominion of another nation depends upon the concept of the "comity of nations." *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895). "Comity" has been described as more than mere courtesy and accommodation, but not achieving the force of an imperative. "Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws." *Somportex, supra*, 453 F.2d at 440. Generally, Texas courts will recognize such a decree where the foreign court is a competent one having jurisdiction over the parties and the subject matter where there was an opportunity for a full and fair hearing before an unbiased tribunal, and where there was no fraud in the procurement of the judgment or any other special reason for dishonoring it. *See, Mpiliris v. Hellenic Lines, Ltd.*, 323 F.Supp. 865 (S.D.Tex.1969), *aff'd* 440 F.2d 1163 (5th Cir. 1971), *Compania Mexicana, supra*, and *Banco Minero v. Ross*, 138 S.W. 224 (Tex.Civ.App.-San Antonio, 1911), *aff'd* 106 Tex. 522, 172 S.W. 711 (1915).

 Defendant contends that this is a proper case for nonrecognition because the Canadian court did not have personal juris-diction over it and, therefore, the resulting judgment entered as a result of Defendant's default is void. Since the Defendant did not enter an appearance in the Alberta court it is entitled to raise its jurisdictional defense in this proceeding. *See, Baldwin v. Iowa State Traveling Men's Association*, 283 U.S. 522, 51 S.Ct. 517, 75 L.Ed. 1244 (1931), and *Sprague & Rhodes Commodity Corp. v. Instituto Mexicano Del Cafe*, 566 F.2d 861 (2d Cir. 1977).

In analyzing whether a court of a foreign country has acquired jurisdiction over the person of a nonresident defendant, courts of this country have applied the traditional American formulations of the due process tests by which a court's exercise of personal jurisdiction over a nonresident defendant is limited by the Fourteenth Amendment. *See, Banco Minero*, 172 S.W. at 714 (following the then current *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1878)), and *Bank of Montreal v. Kough*, 612 F.2d 467, 471 (9th Cir. 1980), *Somportex, supra*, at 443–444, and *Cherun v. Frishman*, 236 F.Supp. 292, 296 (D.D.C.1964), (all applying the "minimum contacts" test set out in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

Due process, as articulated in *International Shoe* requires that before a court may exercise personal jurisdiction over a nonresident defendant, there must exist sufficient "minimum contacts" between the defendant and the forum. In *World-Wide Volkswagen Corp. v. Woodson*, —— U.S. ——, ——, 100 S.Ct. 559, 563, 62 L.Ed.2d 490 (1980), the Supreme Court explained that the concept of minimum contacts performs two functions. First, it protects a defendant from the burden of defending in a forum which is unreasonable because the defendant has had little or no contact with it and second, it acts to ensure that the states do not overreach the limits imposed upon them by their status as coequal sovereigns within the federal system. Of course, a forum does not become an unreasonable one only because the defendant resides a long way from it. That burden is balanced against "the forum state's interest in adju-

dicating the dispute [citation omitted], the plaintiff's interest in obtaining convenient and effective relief [citation omitted], . . the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several states in furthering fundamental substantive policies." *Id.*, at ——, 100 S.Ct. at 564. Many of these same concerns are present with regard to foreign judgments and relations among nations. As the Supreme Court stated in *Hilton v. Guyot*, comity, with respect to the enforcement of foreign judgments, "contributes so largely to promote justice between individuals, and to produce a friendly intercourse between the sovereignties to which they belong, that courts of justice have continually acted upon it, as a part of the voluntary law of nations." 159 U.S. at 165, 16 S.Ct. at 144 (quoting from *Bank v. Earle*, 13 Pet. 519, 589, 10 L.Ed. 274 (1839)). A foreign country's assertion of personal jurisdiction over a nonresident defendant still may be subjected to closer examination than that of our sister states, if only because the burdens placed on the defendant may be far greater there because of possibly greater distances and language differences.

An analysis of Defendant's contacts with Alberta, Canada, makes it abundantly clear that those contacts are substantial and that it would not be unfair or unreasonable to require the Defendant to answer on its contract of guaranty in Canada. The substantiality of a nonresident defendant's contacts with the forum has never depended upon the number of contacts. In *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), the Supreme Court approved the exercise of jurisdiction over a nonresident defendant which had one contact with the forum, the mailing of an offer of reinsurance to a resident in the forum. The Canadian court's exercise of personal jurisdiction over the Defendant is similarly proper in this case.

In *McGee*, the Supreme Court noted that for due process purposes it is sufficient that the suit be based "on a contract which had substantial connection with that State." 355 U.S. at 223, 78 S.Ct. at 201. There the

contract was delivered to California, the premiums mailed from there, and the insured was a California resident when the obligations of the insurance company became due. The Supreme Court also noted that California has a manifest interest in providing a means of effective redress for its residents when their insurers refuse to pay claims. In this case, Defendant delivered two contracts of guaranty to Plaintiff in Calgary, Alberta, Canada. The first contract of guaranty, with a $50,000 limitation, was mailed by Mr. Graham, Defendant's vice-president, with a letter of corporate undertaking and the certified corporate resolution. Later, the $250,000 contract of guaranty was executed and delivered to Plaintiff. These guaranties contemplated that the Royal Bank would lend money to Trentham Canada, in Canada, and that Trentham Texas would answer for those loans in the event that the Canadian corporation defaulted. In *U-Anchor Advertising, Inc. v. Burt*, 553 S.W.2d 760 (Tex.1977), the Texas Supreme Court sanctioned the exercise of personal jurisdiction over a nonresident defendant in a case similar to the one presented here by citing with approval the case of *National Truckers Service, Inc. v. Aero Systems, Inc.*, 480 S.W.2d 455 (Tex. Civ.App.-Ft. Worth 1972, writ ref'd n. r. e.). In that case the Defendant Aero, a Florida corporation, had been doing business in Texas through a subsidiary which became delinquent on its accounts. Aero then agreed to guarantee the subsidiary's debts, executed a guaranty, and mailed it to the plaintiff in Ft. Worth. The guaranty was made performable in Ft. Worth. Relying on the guaranty, the plaintiff continued to extend credit to the subsidiary. The Supreme Court noted: "Of significance in that case was the fact that Aero voluntarily and purposefully agreed to guarantee the debts of its Texas subsidiary. Aero should reasonably have expected to face suit in the Texas courts in the event its subsidiary defaulted on its obligations." *U-Anchor*, 553 S.W.2d at 764. Defendant contends that *Aero* is distinguishable because the guaranty there was to be paid in the forum,

Texas. Defendant contends that the guaranty in this case was payable in Texas, not in the forum, Canada. The guaranty itself calls for payments to be made to the Bank at a branch or agency of the Bank. Defendant argues that since it dealt primarily with Plaintiff's Dallas representatives, the parties contemplated payment in Texas. The Court notes that the parties' dispute concerning whether payment was to be made in Texas and the Plaintiff's countervailing argument that Plaintiff does not have a branch or agency in Texas has generated the most discussion in support of and in opposition to Plaintiff's motion for summary judgment.

■ The Court is of the opinion that this issue as to place of payment is completely immaterial to the issue of whether Defendant has sufficient contacts with Canada. That dispute would be germane only if the situation were reversed, that is, if, in a Texas court, a nonresident defendant were being sued on a contract of guaranty, which might or might not be performable in Texas, and the plaintiff was attempting to effect service of process under the Texas long-arm statute, art. 2031b. It is art. 2031b only that makes the place of contract performance crucial in cases involving the exercise of personal jurisdiction over a nonresident defendant by a *Texas* court. Art. 2031b has no application to the issue of whether a judgment entered by a foreign court satisfies our notions of due process. A nonresident defendant certainly has no due process right to be sued in the place designated for his performance under a contract, or where it is "present" or only where it is "doing business." *See, McGee*, 355 U.S. at 222, 78 S.Ct. at 200. Due process requires only that the defendant have sufficient contacts with the forum to make it appear reasonable and just that the forum enforce the obligations which the defendant has incurred there. *International Shoe*, 326 U.S. at 320, 66 S.Ct. at 160.

■ Defendant relies heavily on the *O'Brien v. Lanpar Co.*, 399 S.W.2d 340, 342 (Tex.1966), formulation of the minimum contacts test. In *O'Brien*, the Court held

that jurisdiction over a nonresident defendant may be entertained if: (1) the nonresident defendant purposefully does some act or consummates some transaction in the forum; and (2) the cause of action arises from that transaction; and (3) the assumption of jurisdiction by the forum does not offend our traditional notions of fair play and substantial justice. Some courts have noted that where the first two *O'Brien* factors are satisfied, there is nothing offensive or inherently unfair about requiring the defendant to make his defense in the forum. *See, Standard Leasing Co. v. Performance Systems, Inc.*, 321 F.Supp. 977, 979 (N.D.Tex.1971), and *Aero*, 480 S.W.2d at 459. The *O'Brien* elements are all satisfied here. The contract of guaranty was consummated in Canada when Defendant delivered the guaranty to Plaintiff in Canada. Although Defendant argues that the contract of guaranty was consummated in Texas because it was executed here, it implicitly recognizes that that is not the case because Defendant also executed a guaranty for $100,000 but did not mail it. Both parties recognize that there is no liability flowing from the mere execution of that document. Plaintiff's lawsuit arose directly out of the contract of guaranty for $250,000 which was ultimately delivered to Plaintiff in October, 1976. Finally, the Court is of the opinion that it was entirely appropriate that Defendant be called upon to defend this lawsuit in Canada. It was in Defendant's business self-interests to establish Trentham Canada, as a potential customer for its engineering know-how. To that end, Defendant agreed to guarantee loans made by Plaintiff to the Canadian corporation. With regard to the $250,000 guarantee, Mr. Trentham, Defendant's president, testified in his deposition that the guaranty limit was raised from $50,000 to $250,000 in connection with a Texaco job which was landed by Trentham Canada from which Trentham Texas had hoped to realize $80,000 in engineering know-how fees. These contacts with Canada must be characterized as purposeful rather than fortuitous. This Court concludes that the Alberta, Canada, court could properly exercise *in personam* juris-

diction over the Defendant based on its contacts with Canada.

Having determined that the Alberta court could, consonant with the restrictions of due process, exercise personal jurisdiction over the Defendant, the issue becomes whether that court in fact acquired jurisdiction over the Defendant. That inquiry requires an examination of Alberta's law regarding service of process. Rules 30 and 31, Alberta Rules of Court, govern service of process outside of Alberta. Rule 30(f) authorizes extraprovincial service where the "proceeding is to enforce, rescind, resolve, annul or otherwise affect a contract or to recover damages or obtain any other relief in respect of the breach of a contract, being (in any case) a contract

"(1) made within Alberta, or

(iii) which is by its terms, or by implication governed by Alberta law . . . ."

Rule 30(j) authorizes service outside of Alberta where "a person out of Alberta is a necessary or proper party to an action properly brought against another person sued within Alberta." Rule 31 requires that every application for extraprovincial service be supported by affidavit stating that the applicant has a reasonable cause of action, showing where service is to be made, and giving the grounds upon which the application is made.

■ It is clear that under the circumstances presented here, service out of Alberta upon the Defendant was authorized. Although the Court has not found any Canadian law on the subject, under Texas law the contract would be deemed to have been made in Alberta because delivery of the guaranty, which was the necessary last step for the formation of a contract, was made to Plaintiff in Canada. *See, Product Promotions, Inc. v. Cousteau*, 495 F.2d 483 (5th Cir. 1974). Such a contract would also impliedly be governed by Canadian law. *See, e. g., Hatchett v. Williams*, 437 S.W.2d 334 (Tex.Civ.App.-Houston (1st Dist.), 1968, writ ref'd n.r.e., *cert. denied*, 396 U.S. 963, 90 S.Ct. 437, 24 L.Ed.2d 427 (1969) in which the court noted that where a contract is made in one state, and is to be performed partly in one state and partly in another, the laws of the state where the contract was made will govern unless the parties intend otherwise. Thus, even if Defendant is correct in that it was contemplated that performance would take place in Dallas, Texas, the application of Alberta law would still be implied. Regardless of the above, it can hardly be contended that Defendant, as the guarantor of Trentham Canada's debts to Plaintiff, was not a proper party to Plaintiff's lawsuit against Trentham Canada on those liabilities. *See, Mercantile Bank of Canada v. Hearsey Transport Ltd., Et Al.*, [1976] 1 Alta.L.R.(2d) Alberta Supreme Court, in which the Court stated that "while it might not be 'necessary' to sue to guarantors in the same action, it is 'proper' to do so."

■ Having concluded that extraprovincial service was authorized, the Court is required to examine whether proper service upon the Defendant was in fact made. The sufficiency of service must be evaluated under Canadian law. *See, Adam v. Saenger*, 303 U.S. 59, 58 S.Ct. 454, 82 L.Ed. 649 (1938). Rule 15 of the Alberta Rules of Court provides: "(2) Personal service is effected on a corporation either (a) in the manner provided by statute, in which case these Rules as to mode of service do not apply, or (b) by leaving a true copy of the document to be served with the mayor, reeve, president, chairman or other head officer by whatever name he is known, or upon the manager, office manager, cashier, secretary or agent." The process-server, Michael Grove, filed an affidavit of service with the Alberta court stating that he had personally served the Defendant by delivering copies of the Amended Statement of Claim and Amended Order to and leaving them with the Defendant at 3303 South Rice, Houston, Texas, on July 17, 1978. In his deposition Mr. Trentham testified that Defendant had an office at that address until the fall, 1978. (Trentham deposition, pp. 10–11).

Plaintiff first contends that service on Defendant was authorized by § 289 of *The*

*Companies Act*, as statutory service provided for in Rule 15(2)(a). Section 289 provides that "[a] document may be served on a company by leaving it at or sending it by registered post to the registered office of the company, or by serving any director, manager, or other officer of the company." Section 73 of the same Act states that "[e]very company shall have *in the Province a registered office*, to which all communications and notices can be addressed." (emphasis added.) In *The Companies Act*, a differentiation is made between a "company," (a company incorporated under the Act) and an "extra-provincial company", (a corporation incorporated otherwise than by or under an Act of the province or an Ordinance of the Northwest Territories). Section 2(8)(18) of *The Companies Act.* The Act also contemplates that every extra-provincial company which does business in Alberta is required to register and designate a local attorney to receive service of process. Sections 166 and 174(1), (6) of *The Companies Act.* Plainly, § 289 does not refer to service of process on a corporation outside of Alberta and the Court must reject Plaintiff's contention and Barrister Rooke's opinion that Defendant was duly served under that section. *See, Banco Minero*, 172 S.W. at 714 (where Texas Supreme Court approved trial court's rejection of expert opinion on foreign law).

In support of its contention that Defendant was nonetheless duly served in accordance with Rule 15(2)(b), Plaintiff has submitted the affidavit of the process-server, Mr. Grove, who states that he personally served Mr. Trentham. Although Mr. Trentham has submitted two affidavits to the Court and has testified at length in his deposition, nowhere does he contest that claim of personal service. Defendant strenuously objects that the Court should not consider Mr. Grove's supplemental affidavit and that the Plaintiff is restricted to the record of service as it appeared in the Alberta court. As a general rule where the jurisdiction of the court rendering the judgment is attacked, the party offering the judgment is not obliged to stand on the record alone, but may present extraneous evidence to show that jurisdiction in fact existed. 50 C.J.S. Judgments § 893. Here it should be noted that the original return of service stated that the papers were delivered to and left with the Defendant. The supplemental affidavit does not contradict that return in any manner, but rather explains to whom delivery was made. Rule 15(2)(b), Alberta Rules of Court, permits service upon a corporation through a broad class of persons, including officers, secretaries, and agents. The Court concludes that the uncontroverted evidence shows that the Defendant was properly served in the Alberta action. The fact that the original return did not indicate specifically on whom service was made for the corporation does not render that Alberta default judgment void under Canadian law, *see, Conn v. City of Calagary*, 9 Land Comp.Rep. 230 (District Court, Judicial District of Calgary, Alberta, 1975) and Alberta Rules of Court, Rules 558, 559, and 142, and, therefore, does not render it unenforceable in this Court. *See, Hungate v. Hungate*, 531 S.W.2d 650 (Tex.Civ.App.-El Paso, 1975, no writ).

Defendant has not contended that it did not have the opportunity for a full and fair hearing, or that the Alberta court was prejudiced against it, or that the judgment was procured by fraud. The statutes and cases submitted by the Plaintiff, as well as our shared common law origins, with Canada, suggest that such an attack upon the Canadian justice system would be extremely difficult to maintain. *See, generally, Toronto-Dominion Bank, supra,* and *Cornfeld v. Investors Overseas Services, Ltd.*, 471 F.Supp. 1255 (S.D.N.Y.1979).

Defendant has obliquely suggested that a special reason exists for not recognizing the Canadian decree and that is: "If the positions of the parties were entirely reversed and Trentham Corporation had secured judgment against the Royal Bank of Canada under the same procedural and substantive format as exists in this case, the Texas Judgment would be unequivocally void for want of jurisdiction. It would not be enforceable in Texas. Canadian Courts would likewise not enforce it. For want of Reci-

procity, the Canadian Default Judgment against Trentham Corporation is not entitled to recognition within the State of Texas or the United States of America."

In *Hilton v. Guyot*, the Supreme Court held that reciprocity with regard to the conclusiveness accorded a United States judgment in a foreign country was required before a judgment of that foreign country's court will be conclusively recognized by a United States court. In a companion case, *Ritchie v. McMullen*, 159 U.S. 235, 16 S.Ct. 171, 40 L.Ed. 133 (1895), the Supreme Court noted that American judgments would be given full and conclusive effect in Canada which will require further discussion.

Defendant has offered absolutely no evidence on the issue of reciprocity. Some courts have held that lack of reciprocity is a defensive matter and that a defendant's failure to offer any evidence would justify the court's refusal to consider the question. *See, Matter of Colorado Corporation*, 531 F.2d 463 (10th Cir. 1976), and *Gull v. Constam*, 105 F.Supp. 107 (D.Colo.1952). *See, also, Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 303 (3rd Cir.) *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972) (concurring and dissenting opinion of Judge Adams), where it was stated that in the absence of proof as to nonreciprocity, the court would assume that Zambia would grant reciprocity to judgments rendered by courts of the United States based on the reasoning that Zambia was a former British protectorate, that England granted reciprocity to United States courts' judgments, and English decisions were authoritative precedents in Zambia.

Rule 44.1, Fed.R.Civ.P. requires that a party intending to raise an issue concerning the law of a foreign country ". . . give notice in his pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." However, the Court has decided to consider the issue of reciprocity on its own initiative because the Defendant apparently has made at least an oblique reference to the issue, because the Plaintiff has noticed its intent to rely on Canadian law and has supplied the Court with a number of statutes, cases, and the legal opinion of a Canadian barrister, and because the issue of whether the Alberta court would give conclusive effect to a Texas court decree is a relatively simple inquiry. *See, Banco Nacional*, 376 U.S. at 412, 84 S.Ct. at 931.

Based on its examination of Alberta case law, this Court concludes that Alberta courts would not recognize a default judgment entered by a United States court under the circumstances presented here. In *Gyonyor v. Sanjenko*, [1971] 5 W.W.R. 381, the court noted that in actions *in personam* "there are five cases in which the courts of this country [Canada] will enforce a foreign judgment: (1) where the defendant is a subject of the foreign country in which the judgment has been obtained; (2) where he was a resident in the foreign country when the action began; (3) where the defendant in the character of plaintiff has selected the forum in which he is afterwards sued; (4) where he has voluntarily appeared; and (5) where he has contracted to submit himself to the forum in which the judgment was obtained." (quoting from *Emanuel v. Symon*, 1 K.B. 302, 309 (1908)). In *Gyonyor*, the court also cited *Sirdar Gurdyal Singh v. Faridkote (Rajah)*, [1894] A.C. 670, in which the court stated that in a personal action, "a decree pronounced in absentum by a foreign Court, to the jurisdiction of which the defendant has not in any way submitted himself is by international law an absolute nullity." Other courts and commentators have noted the recalcitrance of the Canadian courts with regard to giving conclusive effect to the judgments of foreign countries. In *Bank of Montreal v. Kough*, 612 F.2d 467 (9th Cir. 1980), the court stated that it seemed probable that the defendant's contention in that case that the courts of British Columbia would refuse to recognize a default judgment rendered against one of its citizens in the United States under similar circumstances was correct. In Von Mehren & Trautman, *Recognition of Foreign Adjudications: A Survey and a*

*Suggested Approach*, 81 Harv.L.Rev. 1601, 1662 (1968), the authors noted,

". . . because Quebec and a few of the other provinces of Canada drastically limit the effect of foreign judgments, New Hampshire provides that judgments from Canada shall be given the same effects as are given to New Hampshire judgments in Canada. More recently Massachusetts enacted the Uniform Foreign Money-Judgments Recognition Act with the addition of a general reciprocity requirement."

A number of cases, beginning with *Ritchie v. McMullen*, have stated that Canadian courts give conclusive effect to judgments from the courts of the United States. *See, also, Toronto-Dominion Bank; Cherun v. Frishman*, and *Flota Maritima Browning de Cuba v. M/V Ciudad de la Habana*, 218 F.Supp. 938 (D.Md.1963), *aff'd on other grounds*, 335 F.2d 619 (4th Cir. 1964). However, this is true only in a very limited class of cases. Canadian courts generally require for recognition purposes that the foreign court have possessed territorial jurisdiction over the defendant. Note, *Reciprocal Recognition of Foreign Country Money Judgments: The Canada-United States Example*, 45 Fordham L.Rev. 1456 (1977). That commentator concluded that as a result most judgments from the United States would not be recognized in Canada. This Court concludes that the Alberta court would not give conclusive effect to a Texas decree entered under the circumstances presented here.

The only question that remains is whether Texas courts would refuse to enforce a judgment of the Canada court on the ground of lack of reciprocity. Long ago Texas courts, applying the law of the Republic, dealt with the issue of the recognition to be accorded judgments of a foreign nation, i. e. the judgments of states of the United States. In *Phillips v. Lyons*, 1 Tex. 392 (1847), the court followed the majority of the states' decisions, holding that the judgments of foreign countries are only *prima facie* evidence and will admit of almost every defense that could have been set up in the original action. In *Wellborn v. Carr*, 1 Tex. 463 (1847), the court distinguished *Phillips* because it was an action *in personam*, and held that the *in rem* judgments of foreign tribunals are absolutely conclusive, unless procured by fraud or rendered without jurisdiction. Although the court in *Wellborn* did not speak strictly in terms of reciprocity, the court noted that the above *in rem* rule was held to be a universal obligation by the general consent of nations. *Id.* at 469.

Texas state courts again addressed this issue of the effect to be given the decree of a foreign nation in *Banco Minero v. Ross, supra*, 138 S.W. 224 (Tex.Civ.App.-San Antonio, 1911), *aff'd*, 106 Tex. 522, 172 S.W. 711 (1915). In the court of appeals opinion, the court quoted extensively from *Hilton v. Guyot*, and appeared to follow it with regard to the reciprocity requirement:

It is thus seen that the force and effect that should be given a foreign judgment is not determined by how it is regarded by the courts of the country where it was rendered, but what effect they would give a judgment of the same kind rendered by the courts of a foreign country in which it may be made the basis of an action or a ground for defense. And it also conclusively appears, both from the law and evidence, that if a judgment such as the one in question should be rendered in Texas, that it would be regarded as of no force by the courts of Mexico if sought there to be used to enforce a right claimed under it, and that there, as here, it would be regarded good nowhere and bad everywhere. 138 S.W. at 238.

However, those statements were made in connection with the court's discussion of the Mexican judgment against defendant Ross. Ross, a Texas resident, had been served by publication in the Mexican lawsuit. The Texas court noted that under the teaching of *Pennoyer v. Neff, supra*, United States courts would not enforce such a judgment founded on service by publication. In the above quoted excerpt, the court of appeals concluded that Mexican courts likewise would not honor such a judgment if it had

been rendered by a Texas court. The court of appeals also voided the Mexican judgment as it pertained to defendant Masterson, who had voluntarily appeared in the Mexican lawsuit, on the ground that he was arbitrarily denied the right of appeal. Thus, it can be seen that while the court of appeals was speaking in terms of reciprocal treatment, it was actually addressing itself to the more fundamental universal requirement that the foreign court must have obtained personal jurisdiction, including personal service, over the nonresident defendant. This is also borne out by the fact that while the court of appeals noted that Mexican courts would not honor a Texas court decree entered under similar circumstances, it appears that Mexico had already adopted the system of reciprocity in its Code of 1884. *See, Compania Mexicana,* 41 F.Supp. at 909.

In *Banco Minero,* the Supreme Court of Texas quoted extensively again from *Hilton v. Guyot,* but did not mention the reciprocity requirement. That court likewise refused to give effect to the Mexican decree because it was rendered without jurisdiction as to defendant Ross and that defendant Masterson was not afforded a full and fair opportunity to present his defense and that he was denied the right of appeal on what the court labeled a frivolous ground.

In addition to the above noted Texas state cases, a number of Texas federal district courts have dealt with the enforcement of the judgments of foreign countries. In two admiralty cases, the courts noted the general standards governing the recognition of foreign countries' judgments without mentioning the requirement of reciprocity. *Mpiliris v. Hellenic Lines, supra,* and *United States National Bank v. United States,* 23 F.2d 927 (S.D.Tex.1928).

*Compania Mexicana* represents perhaps the most complete discussion of the reciprocity issue to date by a Texas federal court. That case came after *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and the court endeavored to apply Texas law to the enforcement of a Mexican decree which had assessed $6,000 in costs against a Texas resident who had brought a lawsuit for defamation in the Mexican courts. The court noted that the "modern tendency in this country is to recognize foreign judgments *in personam* as conclusive, where they are rendered on the merits, in foreign courts having jurisdiction of the parties." 41 F.Supp. at 909. The defendant in the Texas suit contended first that the Mexican court was without jurisdiction over him because he did not authorize the Mexican attorney to institute the suit for him and secondly, that the assessment of costs against him, which included the opposing attorney's fees, was against the public policy of Texas. In addition to these widely recognized grounds for collateral attack, i. e. lack of jurisdiction and public policy concerns, the court allowed a further collateral attack upon the judgment but found it likewise lacking. The Mexican court rules allowed 8% of the amount sued for as attorney's fees for the victor, as well as 4% of the amount sued for as appellate costs. The Mexican judgment recited that the Texas plaintiff in that suit had sued for $50,000. In the Texas court, the Texas defendant was permitted to attempt to prove that he had not sued for more than $3,000. Thus, it appears that the *Compania Mexicana* court was not following *Hilton v. Guyot* strictly, but instead allowed a fuller inquiry into the merits of the Mexican judgment. The district court did not cite any Texas cases on the enforcement of foreign judgments, although it did rely on Texas cases as to the public policy issue. In affirming the district court, the Fifth Circuit in *Compania Mexicana,* did not mention reciprocity as a requirement for recognition of a foreign country's judgment.

This Court is faced with the problem of applying Texas law in an area where that law is ancient and scarce. At this juncture, it is well to remember that federal courts are not immutably bound under *Erie* to follow state court decisions where it appears that a state court considering the

identical issue would not rely on the precedent. *Hood v. Dun & Bradstreet, Inc.*, 486 F.2d 25, 31 (5th Cir. 1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1580, 39 L.Ed.2d 882 (1974). *See, also* 1A, Part 2, Moore's Federal Practice ¶ 0.309[1]. *Phillips v. Lyons* is the only Texas state court case squarely on point. That was an 1847 case in which the court sought to apply the law of the Republic of Texas. The holding of the *Phillips* court is somewhat undermined in this Court's mind by the following passage:

> "We do not design to discuss the comparative merits of the conclusion to which the American authorities would lead us. It is now a matter of very little consequence, as it will be of rare occurrence to bring a suit upon a judgment not of one of our sister states in our state courts. Suits brought by aliens will generally be in the United States court. . . . On all other judgments [other than state court judgments] we shall be under no such restraint, and between the conflicting decisions we shall feel inclined to yield to the authority of the generality of American decisions, and hold them to be only *prima facie* evidence of the debt." 1 Tex. at 396–397.

This Court has been unable to discover any Texas state court cases in which the *Phillips* rule regarding the effect to be given the judgments of foreign countries has been applied. The few cases which have dealt with this issue have discussed *Hilton v. Guyot*, some mentioning the reciprocity requirement, and others omitting it without discussion. Under these circumstances, the Court deems it appropriate to follow the *Phillips* approach and to examine the judicial and scholarly reaction to the *Hilton* reciprocity rule in an attempt to predict how the Texas Supreme Court would decide the issue today. *See, Nobs Chemical, U. S. A., Inc. v. Koppers Co., Inc.*, 616 F.2d 212 (5th Cir. 1980).

The courts and commentators have almost universally rejected or ignored the doctrine that reciprocity should be required as a precondition to the recognition and enforcement of a foreign country's judgment. Apparently the earliest case that expressly rejected the *Hilton* reciprocity requirement was *Johnston v. Compagnie Generale Transatlantique*, 242 N.Y. 381, 152 N.E. 121 (1926), which is still being followed by New York courts today. *See, e. g., Cornfeld*, and *Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co.*, 470 F.Supp. 610 (S.D.N.Y.1979). In *Somportex*, the court noted that the reciprocity requirement had received no more than "desultory acknowledgment." 453 F.2d at 440. In *Bank of Montreal*, the court noted that the drafters of the Uniform Foreign Money Judgments Recognition Act "consciously rejected reciprocity as a factor to be considered in recognition of foreign money judgments, apparently on the ground that the due process concepts embodied in the Act were an adequate safeguard for the rights of citizens sued on judgments obtained abroad." 612 F.2d at 471–472. Those due process concepts referred to are many of the same concepts already considered by this Court above, i. e., whether the Alberta court had personal and subject matter jurisdiction, whether the Defendant received adequate notice of the proceedings, and whether the judgment was rendered by an impartial tribunal. The Court notes at this time that the fact that a default judgment was entered against the Defendant in Alberta does not dilute its efficacy. *See, Somportex* and *Nicol v. Tanner*, 310 Minn. 68, 256 N.W.2d 796 (Minn.1976). This Court considers the Minnesota Supreme Court's opinion in *Nicol, id.*, to be one of the most persuasive and well-reasoned opinions on this subject. In *Nicol* the court stated:

> "*Hilton* has been severely and consistently criticized by commentators and courts. Three significant criticisms have been advanced. First, *Hilton* mandates a misplaced retaliation against judgment creditors for acts of foreign states irrelevant to their cases and over which they had no control.
>
> "Second, judgments are enforced to bring an end to litigation so that the rights of parties might finally be determined and judicial energies might be conserved. These considerations are thwart-

ed by a reciprocity requirement. The judgment of a foreign nation, when rendered in a proceeding in which the foreign court had jurisdiction and the issues were fully and fairly adjudicated, should be entitled to no less effect on policy grounds than a judgment of another state or federal court . . .

"Third, there is serious doubt that *Hilton* achieves either of its two probable goals: (1) protecting Americans abroad; and (2) encouraging foreign nations to enforce United States judgments. If protecting American interests abroad was a goal of *Hilton*, it is clear that reciprocity does not achieve that goal because it does not look to the fairness or persuasiveness of the foreign judgment.

Furthermore, as stated in Golomb, Recognition of Foreign Money Judgments: A Goal-Oriented Approach, 43 St. John's L.Rev. 604, 616,

'While protecting nationals from unfair treatment abroad is a valid exclusive interest of a state, favoring nationals despite fair treatment abroad should not be commended.' If encouraging foreign nations to recognize our judgments was the goal, Golomb alleges that its achievement has been almost totally unattained. As Golomb concludes:

'If *Hilton* is regarded as an attempt by the Supreme Court to secure recognition for American judgments abroad, not an unreasonable state interest, the decision has not achieved its desired effect. American judgments fare very badly abroad, even today. Possibly the limited application of *Hilton* to judgments rendered against American defendants in favor of [foreign] nationals, when compared to the sweeping reciprocity policies of other nations, reduces its effectiveness as a means of persuading other states to recognize American judgments. The *Hilton* decision did not induce France to relax in its revision au fond. Apparently, the strict reciprocity doctrine of Germany was the motivating factor. Probably more damaging, however, to the fate of

American judgments abroad is that foreign nations with reciprocity rules look at *Hilton,* and conclude that the United States would not recognize one of their judgments. The *Hilton* Rule then leads American courts to refuse recognition to judgments of those countries. This circularity does not further any of the relevant goals of judgment recognition policies. It would seem that a clear renunciation of the reciprocity doctrine by American courts might be a more effective method of obtaining recognition for American judgments in many other nations.'

It thus appears that the most enlightened thinking in American law has rejected the doctrine of reciprocity. Both Restatement, Conflict of Laws, 2d, § 98, Comment E, and the Uniform Foreign Money-Judgments Recognition Act, 9B U.L.A. 64, do not require reciprocity. We therefore decline to adopt the doctrine of *Hilton* and hold instead that reciprocity is not a prerequisite to enforcement of a foreign judgment in Minnesota. It is not the business of the courts, whose province is the decision of individual cases, to impose rules designed to coerce other nations into giving effect to our judgments. Reciprocity has no basis in the policies or rules that underlie the just and fair disposition of a case involving a foreign judgment; accordingly, it should have no place in our law."

In addition to those referred to above, other authorities have favored not requiring reciprocity as a condition precedent to recognition. *See, e. g. Toronto-Dominion Bank* (predicting the decision of the Supreme Court of Arkansas), *Von Mehren & Trautman, supra*, Peterson, *Foreign Country Judgments and the Second Restatement of Conflict of Laws*, 72 Colum.L.Rev. 220 (1972), Carl, *Recognition of Foreign Judgments—And Vice Versa*, 13 Hous.L.Rev. 680 (1976). *Contra, Svenska Handelsbanken v. Carlson*, 258 F.Supp. 448 (D.Mass.1966) and *Venezuelan Meat Export Co. v. United States*, 12 F.Supp. 379 (D.Md.1935). The great weight of modern authority favors

dispensing with the *Hilton* rule. *See*, Underhill, *The Present Status of the Doctrine of Hilton v. Guyot*, 6 So.Tex.L.J. 129 (1962). In *Phillips v. Lyons*, the earliest Texas case, the court made a survey of the American authorities and adopted the majority rule regarding the effect to be given foreign countries' judgments. This Court predicts that if the Texas Supreme Court were accorded the opportunity, although that is somewhat unlikely given the federal jurisdictional basis that these suits almost invariably have, it would adopt the modern, and majority, rule and ignore reciprocity as a requirement for recognition of a foreign country's judgment. Therefore, this Court can see no due process or public policy impediment to the enforcement of the Canadian judgment. It is therefore, ORDERED that Plaintiff's motion for summary judgment is GRANTED.